732 A.2d 254 (1999)
In re T.W.
S.A., Appellant.
No. 98-FS-1900.
District of Columbia Court of Appeals.
Argued May 25, 1999.
Decided July 15, 1999.
*256 Karen L. Terhune, appointed by the court, for appellee T.W.
Charles A. Moran, appointed by the court, Washington, DC, for appellant.
Donna M. Murasky, Assistant Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia.
Before STEADMAN and SCHWELB, Associate Judges, and GALLAGHER, Senior Judge.
SCHWELB, Associate Judge.
The "Wednesday's Child" television program, a weekly segment of Channel 4 news, is designed to bring potentially adoptable children to the attention of prospective adoptive parents who have room for them "in [their] homes and in [their] hearts." The program highlights one child (or a group of siblings) and invites viewers to consider adopting the child or children depicted on the screen. It is undisputed that Wednesday's Child has generated increased interest in the adoption of children who have appeared on the program.[1]
On December 15, 1998, the trial judge issued an order authorizing the appearance on Wednesday's Child of respondent T.W., a neglected child who is in the custody of the Department of Human Services (DHS). T.W.'s biological father, S.A., appeals, contending that the judge erred by permitting the presentation of T.W. to the viewing public as available for adoption when the father's parental rights remain intact. We affirm.

I.

PRIOR PROCEEDINGS
T.W. was born on May 9, 1994. His parents were not married. For the first three months of his life, T.W. lived with his biological mother. The mother was unable to provide appropriate care for T.W., however, and child neglect proceedings were instituted in May 1995. In June 1996, in conformity with a stipulation signed by his mother, T.W. was committed to the custody of DHS, and he was placed in a residential facility known as Grandpa's House. T.W. has an extensive medical history and "significant cognitive and physical delays." He has lived in various medical and child care institutions for most of his life.
Following T.W.'s commitment, DHS initially adopted a case plan aimed at achieving T.W.'s reunification with his mother. The mother agreed to the case plan, but she apparently failed to follow through. In March 1997, DHS concluded that the mother had made no progress toward the objectives outlined in the case plan. DHS therefore changed the goal of its planning for T.W. from reunification with the mother to adoption. The revised goal was approved by the Superior Court.
*257 In December 1997, T.W.'s guardian ad litem (GAL), working in collaboration with a DHS social worker, filed a petition to terminate the parental rights of both of T.W.'s parents. It was apparently in connection with the TPR proceeding that T.W.'s biological father was identified and located. At the time, the father was incarcerated. The father had never had any contact with T .W., and he claims that he had been told that T.W. was dead.
On October 9, 1998, the court in the TPR case issued an order terminating the mother's parental rights. The petition to terminate the father's rights was dismissed. The mother filed a timely appeal from the order terminating her rights. That appeal is presently pending in this court. See No. 98-FS-1663.
Meanwhile, in pursuit of the goal of achieving T.W.'s adoption, the GAL filed a motion to waive confidentiality so that T.W. could be interviewed on Wednesday's Child. The father opposed the GAL's motion.[2] Although he remained incarcerated, the father claimed that T.W.'s paternal relatives (and especially T.W.'s paternal grandmother, who lives in North Carolina) were seeking to establish a relationship with T.W., and that placement with a relative "and perhaps custody" was "a distinct possibility." The father argued that the judge lacked authority to "waive confidentiality" and that, even if such authority existed, its exercise would be an abuse of discretion in light of the circumstances before the court.
On December 15, 1998, the trial judge issued a written order granting a "limited" waiver of confidentiality. After summarizing the facts set forth above, the judge held that "it is in the respondent's best interest, given his special medical needs and his three-and-a-half years of institutionalization in the foster-care system, to exercise vigorous efforts to recruit an appropriate adoptive family using all available resources." The judge found that
[t]he Wednesday's Child Program is a highly effective tool for generating inquiries by prospective adoptive families in the D.C. Community. Mr Luke Okoli, social worker with the Adoption Recruitment Unit of [DHS], has advised that fifty percent of the inquiries his unit receives from persons interested in adoption are in response to the Wednesday's Child program.
The judge held that "synchronous with efforts to identify an adoptive family, the case worker may follow up with various paternal relatives who have expressed an interest in establishing a relationship with the respondent." The judge then ordered that
[t]he respondent's first name, interests, and likeness can be disseminated for the purpose of recruiting a potential adoptive family. The respondent may appear on the Wednesday's Child program provided no information is revealed regarding the respondent's biological family or his status as a neglected child. Furthermore, the respondent's appearance on the Wednesday's Child program shall not occur until after January 15, 1999.
The father filed a timely notice of appeal, and he applied in this court for a stay of the judge's order. On January 15, 1999, a motions panel of this court denied the application "inasmuch as the order allows only for disclosure of minimal biographical information that does not specifically identify appellant or the minor child." We were advised at oral argument, however, that as of that time, T.W. had not yet appeared on Wednesday's Child.

II.

LEGAL DISCUSSION
The father contends that the trial judge lacked authority to issue the order partially *258 waiving confidentiality and that T.W.'s appearance on the Wednesday's Child program would violate the father's parental rights. We do not agree.

A. The trial court's authority as parens patriae.

For almost his entire young life, T.W. has been in institutional foster care. His biological parents have not cared for him. Although he is now five years old, T.W. has never had a permanent parental figure in his life. Both DHS and the trial court have recognized that placing T.W. in a permanent home and providing him with a loving family are goals that should be accorded high priority and energetically pursued.
In In re Application of L.L., 653 A.2d 873, 888 (D.C.1995), this court described in some detail "[l]egislation on the federal and local levels [which] has been enacted to counteract the dangers inherent in the consignment of neglected children for an indefinite period to temporary expedients such as foster care." The Supreme Court has recognized, and so have we, that "protracted stays in [foster] care... may deprive [neglected] children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens." Smith v. Organization of Foster Families for Equality & Reform, 431 U.S. 816, 835-36 n. 37, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); L.L., supra, 653 A.2d at 887-88 (quoting Smith ). "[N]o child can grow emotionally while in limbo." L.L., supra, 653 A.2d at 887 (citation and internal quotation marks omitted). If reunification with a biological parent is not feasible, and if a child is adoptable, then "adoption is the statutorily preferred plan, for the goal of permanency planning is to end the uncertainty of foster care and allow the dependent child to form a longlasting emotional attachment to a permanent caretaker." Id. at 888 (citation and internal quotation marks omitted). To "wait and see" is rarely, if ever, an acceptable option when so much time has already passed. Id. at 887-89.
In this case, DHS initially attempted to work towards T.W.'s reunification with his mother, but revised the goal to adoption when the mother failed to cooperate. With the appearance of the father, DHS is appropriately exploring the feasibility of placing T.W. with his paternal grandmother or with some other relative. The prospects for such a disposition are uncertain, however, and DHS is quite properly continuing to pursue adoption outside the family if no family member is available.
But T.W. is no longer an infant. He is afflicted with health problems and has special needs. Finding a family willing to adopt T.W. may not be easy, and the prospects of success will obviously be enhanced if DHS is able to reach as many prospective adoptive parents as possible. Exposure on the Wednesday's Child program, which is viewed by a large audience, can therefore be expected to improve T.W.'s chances of adoption. DHS has legal custody of T.W., and by asking the court to permit an appearance by T.W. on Wednesday's Child, the agency acted in T.W.'s interest and made it more likely that he can be removed from institutional foster care and placed in a permanent adoptive home, if this is the course of action that is ultimately selected.
In the District of Columbia, as in most or all jurisdictions, the paramount consideration in this type of dispute is the best interest of the child. See L.L., supra, 653 A.2d at 880 (citations omitted). The trial court, as parens patriae, has the obligation to protect the child's welfare. See, e.g., In re O.L., 584 A.2d 1230, 1233 (D.C. 1990). The District's civil neglect statute, which codifies the "best interest" standard, is a remedial enactment designed to protect the welfare of neglected and abused children, and it must be liberally construed to achieve that end. Id. (citation omitted).
The neglect statute vests the judges of the Superior Court with broad authority to *259 protect the safety and welfare of neglected children. See generally D.C.Code § 16-2320(a) (1997). In addition to authorizing the Family Division of that court to issue a wide variety of remedial orders, including, inter alia, termination of parental rights, D.C.Code § 16-2320(a)(6), the statute provides that the Division "may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child." § 16-2320(a)(5). The Division is further authorized to "order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within such agency's legal authority." § 16-2320(a)(5)(i). If DIIS has the right and duty to introduce neglected children to prospective adoptive parents so as to facilitate adoptionand the existence of that right and duty cannot reasonably be questionedthen the court may surely authorize that agency to undertake any lawful measure reasonably calculated to achieve that end. Accordingly, unless the father can show that the limited disclosures regarding T.W. which the trial judge authorized in her order are "prohibited by law," D.C.Code § 16-2320(a)(5), that order, in our view, falls well within the judge's authority as parens patriae.

B. The confidentiality of child neglect proceedings.

The father asserts that T.W.'s appearance on the Wednesday's Child program is proscribed by certain statutes and rules of court providing for the confidentiality of child neglect proceedings. We do not believe that any of these restrictions on disclosure can reasonably be viewed as having any application to the case before us.
We think it important to emphasize that the disclosure authorized by the trial judge's order, which we have quoted on page 4, supra, is very limited. As the motions division pointed out in denying the father's application for a stay, that order permits DHS to reveal only minimal biographical information, without identifying either T.W. or the father. A person who tunes in on Wednesday's Child will learn only T.W.'s first name and not his full identity. The viewer will also see what T.W. looks like, learn something of this five-year-old's "interests," and ascertain that the boy may be available for adoption. The audience will learn nothing about T.W.'s family, and his status as a neglected child will not be revealed. T.W.'s father is thus complaining of a prospective telecast which will not identify the father or disclose anything about him. Given the father's complete lack of contact with his son during the first five years of T.W.'s life, there is little, if any, possibility that the viewer will be able to associate the child on the screen with his biological father.
No adoption can be consummated unless prospective adoptive parents are first apprised of some basic information about a child or children. It is this kind of basic information that the Wednesday's Child program will provide to its audience under the trial judge's carefully crafted order. The disclosure to individual prospective adoptive families of limited information about a child is surely the norm. If it were not, the adoption process would soon come to an unceremonious halt. The responsibility of DHS to attempt to find adoptive parents for a neglected child obviously requires some limited initial introduction to them of the prospective adoptee. The notion that, under these hypothetical circumstances, DHS is barred from telling an interested family the child's first name, or from displaying the child's photograph, is contrary to common sense. Such a prohibition would undermine the agency's legal authority to act in the interest of neglected children.
T.W.'s appearance on Wednesday's Child would, of course, be viewed by more people than an introduction to an individual family would reach. Nevertheless, this situation is indistinguishable in principle from the agency's routine interaction with an individual prospective adoptive family. *260 The information made available to viewers through the television program would be insufficient to identify T.W. or his parents. It could do no more than pique their interest in the possibility of adopting T.W. If, and only if, a family that viewed the program expressed such an interest, then more extensive information about the child might be provided. Such additional information would not, however, differ from that routinely made available to families that have given active consideration to adopting a particular child.
The confidentiality statutes and rules on which the father places reliance are limited in scope. They render confidential only judicial records and proceedings,[3] records compiled by District of Columbia agencies responsible for the welfare of neglected children,[4] and information acquired by DHS staff.[5] These provisions do not, by their terms, proscribe the limited disclosure authorized in this case by the trial judge. T.W.'s appearance on the screen, and the revelation of his first name, largely reflect what is already in the public domain, for everyone who has contact with T.W. knows what he looks like and what he is called.[6] The Wednesday's Child program would result in little, if any, disclosure of the contents of confidential records, and although the fact of T.W.'s potential adoptability would be revealed, a viewer who did not already know T.W. would not learn T.W.'s identity.
By order of the Superior Court, DHS has legal custody of T.W., and therefore has both the authority and the legal duty to speak and decide for him in furtherance of his best interest. T.W.'s GAL was appointed for the express purpose of representing T.W.'s interests before the courts. DHS and the GAL both support T.W.'s appearance on Wednesday's Child. The confidentiality provisions, like the child neglect statute as a whole, were designed primarily to promote the best interests of neglected (and delinquent) children. See, e.g., District of Columbia v. Cooper, 483 A.2d 317, 323 (D.C.1984). "[O]ther interests may require the veil of secrecy to be lifted," id. at 322, and the enhancement of T.W.'s chances for adoption is assuredly such an interest, especially where, as here, the disclosure permitted by the court is so limited in scope. T.W.'s right to confidentiality, like other rights, can be waived in his own interest, and the trial court is not precluded by the confidentiality statutes and rules from authorizing DHS to take, on T.W.'s behalf, actions which T.W., if he were of age, would surely have the right to take for himself.[7] Remedial child neglect legislation should not be construed to deprive the court of the use of effective tools to assist a neglected child to find a suitable adoptive family. Cf. O.L., supra, 584 A.2d at 1233.
Finally, any prejudice to the father is minimal or nonexistent. We agree with the District that
[t]his broadcast was not likely to reveal any confidential information about [the] father.... Any marginal embarrassment or harm to [the father's] reputation that any broadcast would occasion... was plainly outweighed by the interest of T.W. in finding a home that neither his father nor his mother has ever provided him.

*261 C. The father's parental rights.

The father next asserts that the trial judge's order interferes with the father's statutory and constitutional rights as T.W.'s parent. We do not agree.
The father recognizes that T.W. is in the legal custody of DHS. He argues, however, that his own rights as a parent have not been terminated and remain intact, and that he therefore has the absolute authority to prohibit his son's appearance on Wednesday's Child. It is true, of course, that the judicial decree committing T.W. to the agency's custody did not extinguish all of the father's parental rights. On the contrary, the father retains certain rights as a parent unless and until those rights have been terminated by judicial decree.
The father of a child who has been committed to the custody of DHS does not, however, have the right to exercise control over the committed child's daily life. A parent's "residual" rights and responsibilities are defined in the statute as
those rights and responsibilities remaining with the parent after transfer of legal custody or guardianship of the person, including (but not limited to) the right of visitation, consent to adoption, and determination of religious affiliation and the responsibility for support.
D.C.Code § 16-2301(22). The trial judge's limited order does not purport to deprive the father of any of the rights or responsibilities enumerated in the statute, or of any other comparable right or responsibility. The father's statutory contention therefore fails.
The father's constitutional argument fares no better. At best, it is premature. To the extent that the father's right to raise his son as he sees fit, see generally Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re T.J., 666 A.2d 1, 11-12 (D.C.1995), petition for reh'g en banc denied, 675 A.2d 30 (D.C.), cert. denied, 517 U.S. 1028, 116 S.Ct. 2571 (1996), has survived T.W.'s commitment to the custody of DHS, that right is not impaired by the judge's limited order authorizing T.W.'s appearance on Wednesday's Child. Indeed, if T.W. appears on that program, the father will retain the rights that he had prior to his son's appearance. If the program attracts a prospective adoptive family, the father will remain free to contest any proposed adoption.[8] We perceive no plausible basis for challenging the judge's order on constitutional grounds.

D. The judge's exercise of discretion.

Finally, the father contends that even if the trial judge had the legal authority to issue her order, and even if the order did not violate the father's statutory or constitutional rights, the judge nevertheless abused her discretion, on the record before her, by permitting T.W.'s appearance on Wednesday's Child. The father claims to have been unaware, until recently, of his son's existence. He asserts that his own mother, T.W.'s paternal grandmother, has expressed interest in caring for T.W., and that other family members may be available as well. Under these circumstances, according to the father, the advertising of T.W. to the general public as an adoptable child is premature and constitutes an unwarranted intrusion into the life of the family.
We agree with the father that the trial judge's discretion in this sensitive *262 area is not unlimited. It is useful to remember that our child neglect statute, like its Pennsylvania counterpart,
was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.
In re Rinker, 180 Pa.Super. 143, 117 A.2d 780, 783 (1955). The kinds of motivations described by the court in Rinker do not justify the removal of a child from a parent's custody, and they are likewise insufficient to warrant the televised display of a child for the purpose of attracting potential adoptive parents to replace a birth parent. We also agree with the father's contention that, even where a biological parent is unable or unwilling to care for a child, the parent's realistic preference for the placement of the child with a fit relative is entitled to significant weight. See T .J., supra, 666 A.2d at 14-15; but cf. In re AN.C., 722 A.2d 36, 40-41 (D.C.1998) (emphasizing that, in the interest of the child, such a preference must be expressed without undue delay).
In this case, however, we are dealing with a neglected youngster who has been committed to the custody of DHS. Indeed, T.W. has been in institutional care for almost all of his five years. His birth parents have had no appreciable contact with him. He has an overriding need for a permanent and stable home and a loving family. There has already been too much delay in achieving that goal.
The trial judge recognized the urgency of T.W.'s needs. She approved the Wednesday's Child appearance as a means to accelerate the search for adoptive parents. At the same time, the judge wisely authorized the simultaneous pursuit of a potential placement with T.W.'s paternal grandmother or with some other relative. We conclude that the judge exercised her broad discretion judiciously, and that there was no error.
Affirmed.
NOTES
[1] According to the old Mother Goose rhyme, Tuesday's child is full of grace, but Wednesday's child is full of woe. The televised version of Wednesday's Child was plainly designed to replace woe with joy for the children appearing on the screen.
[2] The mother also opposed the motion, but her parental rights were terminated before the judge could decide it.
[3] See Super. Ct. Neg. R. 30.
[4] See D.C.Code §§ 16-2331, -2332.
[5] See D.C.Code §§ 6-2111(a), -2126, -2127 (1995).
[6] Cf. Rogers v. United States, 566 A.2d 69, 75-76 (D.C.1989) (en banc) ("[w]hile the official records of a juvenile's involvement with the criminal justice system are confidential, there is no means of `sealing' information about a person's actions to prevent informal transmission by those who know about such acts").
[7] In light of the foregoing, it is not at all clear that DHS was required to obtain the court's permission before arranging for T.W.'s appearance on a Wednesday's Child program. No party has argued that judicial authorization is unnecessary, however, and we do not decide that question.
[8] If the Wednesday's Child program is successful in bringing a suitable adoptive family into the picture, then the case for termination of the father's parental rights may be strengthened. See, e.g., In re A.B.E., 564 A.2d 751, 756-57 (D.C.1989). But DHS' judicially approved possible goal for T.W. is adoption, and any steps taken by DHS toward that end would potentially weaken the father's position in any future TPR or adoption proceeding. Since it is DHS' obligation to pursue adoption, as one possibility, any incidental effect on the father's prospects of prevailing in hypothetical future litigation cannot render such pursuit unlawful.