In Re A.H., De.H., K.H., Shl.H. and S.H., Respondents.

D.H., Appellant.

No. 01–FS–764, 01–FS–765, 01–FS–766, 01–FS–767, 01–FS–768.

District of Columbia Court of Appeals.

Argued Nov. 20, 2003.

Decided Feb. 26, 2004.

Rhonda R. Brown appointed by the court for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, were on the brief, for appellee District of Columbia.

Christopher May, Washington, DC, and Charles J. Szlenker filed statements in lieu of a brief on behalf of respondents.

Before STEADMAN, SCHWELB and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

D.H. asks us to reverse the judgment of the trial court that she neglected her five small children by allowing them to live in an unsafe and unsanitary home environment. D.H. contends that the evidence of deplorable conditions was insufficient to support the judge's findings of neglect,

especially his finding that those conditions were not due to her lack of financial means. We are satisfied, however, that the requirements of our neglect statute were met, and there was no failure of proof. We affirm the judgment on appeal.

## I.

The five respondents in this case were between seven months and seven years of age when the Child and Family Services Agency (CFSA) removed them from the care of their mother, appellant D.H., and petitioned the Superior Court Family Division to find them neglected. The children had been residing with D.H. and their maternal grandmother J.H. in a two-story townhouse apartment in East Capitol Dwelling, a public housing project operated by the District of Columbia Housing Authority. Citing D.H.'s tolerance of conditions in the apartment that rendered it "uninhabitable for humans" and threatened the health of its occupants, including accumulations of human feces and rotting food on the floors and "an enormous cockroach infestation" throughout the premises, the CFSA charged that the children were without proper parental care and control necessary for their physical, mental, and emotional health, and that the

deprivation was not due to their parent's lack of financial resources. *See* former D.C.Code § 16–2301(9)(B) (2001).[1] The social worker who initiated the neglect petition, Kimberly Kellerhouse, suspected that D.H. and J.H. suffered from a "deep seated depression or mental illness" that explained why they "would allow themselves and the children to live in such a subhuman environment."[2]

At the fact-finding hearing, the trial court received testimony from four witnesses in the following order: Vivian Norris, the East Capitol Dwelling property manager who referred the H. family to CFSA in June of 2000;[3] Ms. Kellerhouse, the petitioning social worker; Metropolitan Police Officer McKoy Perry, who assisted in the emergency removal of the children from the home; and D.H. The respondents' grandmother J.H. was present during the proceeding but was not called as a witness.[4]

Vivian Norris testified that she first came in contact with the H. family when she participated in a required property inspection in January 2000. Ms. Norris stated that when she entered the H. home, she smelled a "foul odor" from feces and

1. As a result of the amendment of the neglect statute by the Improved Child Abuse Investigations Amendment Act of 2002, D.C. Law 14–206, 49 D.C.Reg. 7815 (2002) (effective October 19, 2002), the definition of neglect contained in former § 16–2301(9)(B) now appears without change in D.C.Code § 16–2301(9)(A)(ii) (2002).

2. The CFSA petition included an allegation that D.H. was unable to discharge her parental responsibilities because of mental incapacity, which was an additional ground on which the respondents could have been found to be neglected. *See* D.C.Code § 16–2301(9)(A)(iii) (2002), formerly § 16–2301(9)(C). The government dropped this charge before the fact-finding hearing.

3. This was actually the second referral of the H. family to the CFSA. Two months earlier, in April 2000, a caller on the CFSA hotline reported that the H. children were outside in an alley, unsupervised, improperly dressed, and playing in a pool of rain water. According to the neglect petition, a CFSA worker went to the home to investigate the report and was denied entry by the children's grandmother. The investigator allegedly "could smell noxious odors coming from inside" the house. A social worker to whom the matter was referred failed to follow it up.

4. The respondents' fathers did not appear at the hearing, though they were represented by counsel.

waste and saw "trash all over the floor." [5] The children were running about, naked or minimally clothed, and visibly dirty (though they did not appear to be ill or disabled). In the kitchen, Ms. Norris noticed that the gas oven was on, the oven door was open, and the burners on the stove were lit. Because the children were playing in the kitchen, Ms. Norris turned the oven and burners off and told D.H. "that wasn't safe with them running around and having the door all the way down and the oven on." D.H. responded that she needed the oven to provide heat because her furnace had stopped working. D.H. had never complained about the lack of heat or reported that the furnace was broken.

Ms. Norris stated that the kitchen was in "deplorable" condition. "[T]here was some meat out on the table that looked as if it was just sitting there to be cooked 'cause it was raw meat. But it had roaches crawling on it. She had other types of open food on the counter and dirty dishes and stuff like that with roaches crawling all around, the table and counter top areas." The rooms upstairs were in no better shape. "The bedrooms had clothes and trash all on the floors, I mean to the point where you would have to kick through it to get into that space. And that's in every room." The bathroom was "filthy," and Ms. Norris found feces in the "baby pot" and the bathtub. D.H. told her that the family had been using the bathtub as a toilet because the toilet was "stopped up." As in the case of the furnace, D.H. had never reported this problem.

Following this inspection, Ms. Norris arranged for repairs and maintenance to be performed in the townhouse, including a

roach extermination ("they would have to bomb. It wouldn't just be a spray extermination"). Ms. Norris reinspected the apartment the following week and again in May 2000. On each occasion, Ms. Norris testified, the unit was still fetid and filthy as before, even after repairs supposedly had been made,[6] a roach extermination had been done, and D.H. had been urged to clean up the premises and been served, in February, with a "cure or vacate" notice citing the obligation under the lease to keep the premises in a safe and sanitary condition, free of trash and debris.

During her last visit, in May, Ms. Norris told D.H. and J.H. that she would notify the CFSA because the children never had clothes on and were not in a clean environment, and D.H. and J.H. were doing nothing about it. According to Ms. Norris, D.H. was "nonchalant," saying that she had cleaned the house and acting as if "she didn't see anything wrong with that situation."

Kimberly Kellerhouse became involved with the H. family after the CFSA was notified. Ms. Kellerhouse testified that she worked with Families Together, a crisis intervention program run jointly by the CFSA and a private social services agency to help families with abused or neglected children remain intact and avoid removal of the children to foster care. Ms. Kellerhouse and an assistant met the H. family for the first time on June 19, 2000, when they visited the home to begin a week-long suitability assessment.

When she entered the apartment on June 19, Ms. Kellerhouse testified, she was hit with "the stench of stale urine." Wherever she looked, "the walls, the floors, the

---

5. "I mean," Ms. Norris testified, "trash we normally put in the trash can."

6. Ms. Norris continued to observe feces left in the bathtub. She was told that the toilet had stopped working again. No repairs had been requested, however.

ceiling were smeared in clumps with dust and dirt." The floor between the living room and the kitchen was "rotted." Ms. Kellerhouse learned that the hot water heater and the heating system in the apartment were broken and there had been no heat all winter. The refrigerator had also been broken for some time. Throughout the apartment, cockroaches were rampant:

> They were on the walls, the floors, the furniture. There was a dresser in the home in the living room and clothes were stacked in, on, around it. There were cockroaches crawling in, on, around it.
>
> ✻     ✻     ✻     ✻     ✻     ✻
>
> [In the kitchen, Ms. Kellerhouse saw] [g]rease all over the counters, all over the stove, and there were . . . open pots of grease, with, it could have been decaying food . . . . Cockroaches crawling in and out of those pots, cockroaches crawling in and out of the stove, all over the sink. There were canned goods on the table, insects crawling on that.

At one point one of the children came into the apartment with a hot dog and the grandmother reached behind the roach-infested dresser in the living room and produced an open bottle of ketchup for the girl to use.

Ms. Kellerhouse interviewed D.H. as part of her initial assessment. D.H. told her that she could not get up early enough in the morning to hold a job, though she had worked in a summer job when she was in high school. D.H. was not able to provide definite information about the condi-

tion and maintenance of the apartment. For example, Ms. Kellerhouse "asked about the heat and didn't ever really get an answer as to why the heat had never been fixed." Ms. Kellerhouse "asked how long the hot water had been broken and if it affected the plumbing and was told, 'Well, sometimes.'" Ms. Kellerhouse "asked questions about . . . the responsiveness of D.C. Housing . . . and was told it was not what the tenants would have hoped." Ms. Kellerhouse told D.H. that the apartment was not a fit place to live and that she would investigate alternatives. In response, and throughout the interview, D.H. was notably passive[7] and seemingly acquiescent in the deleterious conditions in which she and her children were living. Ms. Kellerhouse "didn't get a sense of urgency. . . . [She] got, really, a sense of apathy." Ms. Kellerhouse ascertained that D.H. had never been assessed for clinical depression or other mental health issues.

Ms. Kellerhouse returned to the H. residence four days later, on June 23, 2000. Conditions in the home were, if anything, worse. Upon her arrival, Ms. Kellerhouse testified, "[t]he smell of feces was so pungent that it caused [her] to gag." There were, she observed, four piles of feces on the floor in the living room. D.H. said that one of her sons had defecated there that morning. She had done nothing about it. Ms. Kellerhouse had to prod D.H. to clean up the feces and then had to instruct her to use a wet mop after D.H. unsuccessfully tried to make do with a dustpan and broom.

---

7. Ms. Kellerhouse described D.H.'s demeanor during the interview in the following terms:

> When a direct question was asked, D.H. would pull out her lips and squint and then there'd be a silence. And sometimes she'd look to her mother, sometimes she'd just look straight ahead. And, after a while, I would say, "Are you thinking about what I asked you?" And sometimes she'd say, "Yes," and sometimes she'd say, "No." And if she said, "yes," I'd probe for a deeper answer. If she said "no," I'd try to repeat my question in a different way.

Ms. Kellerhouse visited the H. family again on June 27, 2000. The apartment was still filthy and roach-infested. During this period, Ms. Kellerhouse took steps to help the H. family with its housing situation. She hand-delivered a letter to the D.C. Housing Authority in which she catalogued what needed to be done in the East Capitol Dwelling apartment.[8] In addition, she or her aide investigated alternative housing options and helped D.H. to recertify for a housing subsidy. Ms. Kellerhouse also inquired into obtaining new furniture for the H. family.

Despite these efforts, Ms. Kellerhouse and her supervisors became convinced that the Families Together Program would not be able to help the H. family and that the children needed to be removed for their own safety. In part this was because Ms. Kellerhouse developed concerns about D.H.'s parenting; she described, for example, seeing D.H. ignore her baby's cries during one visit and threaten her children with a belt on another occasion. D.H. told Ms. Kellerhouse that she administered "whoopings" if the children went too close to the stove or misbehaved.[9] More important to Ms. Kellerhouse, though, was the "level of desensitization" that D.H. and the H. family displayed with respect to the deplorable surroundings in which they were living. Ms. Kellerhouse doubted the family's "emotional or mental capacity" to benefit from the help being offered. "It was my opinion," Ms. Kellerhouse testified, "that this was a family that had resigned themselves to, 'These are the conditions in which we live.' And that there was ... a deeper issue than introducing these people to appropriate cleaning methods. That there had to be something going on emotionally or mentally to just create that level of desensitization."

On June 29, 2000, Ms. Kellerhouse and the CFSA case worker removed the H. children from the home. The following day they filed a neglect petition in Superior Court.

The police officer who assisted in the removal of the children on June 29 was Officer McCoy Perry. Officer Perry's observations that day matched those of Ms. Norris and Ms. Kellerhouse. "Immediately upon entering the residence," Officer Perry testified, he smelled the "strong odor" of human feces and urine. He saw feces in the living room and in the bedroom. He also saw knives, trash, and food on the floor, a dead mouse on the stairs, and a "complete roach infestation in the entire unit." He saw that the children were not wearing shoes or clothes other than underwear and that one child was wearing a diaper that was "almost falling off it was so full of urine."

The only other witness at the fact finding hearing was D.H. herself. D.H. testified that she was twenty-two years old and had completed the eleventh grade in high school. She had moved into the East Capitol Dwelling apartment with her family in 1996. According to D.H., repairs that were supposed to have been made then were never completed, and major systems and appliances in the apartment had not worked for a long time. In particular,

8. Among other things, Ms. Kellerhouse's letter identified the need to exterminate monthly and to replace or repair the refrigerator, the hot water heater, the floorboards, the kitchen cabinets, the screen door, and the heating system.

9. Ms. Kellerhouse did not witness D.H. abuse her children, however, nor did she observe any signs of physical mistreatment. She testified that the H. children did not appear sick or malnourished; they had the required immunizations; they had clothing to wear; and the two children of school age were attending school.

D.H. testified, the refrigerator did not work, the heating system had not worked since September 1999, and the plumbing did not work for two months during the winter of 1999–2000 (though the toilet was fixed and was working thereafter). The maintenance staff had promised to restore heat but had failed to do so; as a result, the family used the gas oven to heat the house day and night. A roach extermination was performed in 2000, but the roaches returned. D.H. made few efforts to remedy these problems. She testified that she stopped complaining about them after someone in the apartment manager's office insulted her by telling her she "sounded like a child." Since the lease was in her mother's name, D.H. relied on her mother to make complaints. D.H. admitted that she did not pay "too much attention" when Ms. Norris discussed a program to "organize the house," and she minimized the advice and assistance that Ms. Kellerhouse and the Families Together Program offered.

D.H. emphatically denied that the conditions in the apartment were as bad as the other witnesses had described them. She accused each of the other witnesses of exaggerating and outright lying about such things as the trash strewn on the floor, the filth and the degree of roach infestation.[10] D.H. testified that she washed dishes daily, did major cleaning every Sunday, and did the laundry every two weeks. She claimed that she kept fresh food in the house, despite the lack of a working refrigerator, by going shopping every day. D.H. said that all her children were healthy and that her older children were doing well in school. She did not think the lack of heat was a problem for the children or that she was irresponsible in keeping them in an unheated apartment through the winter, because they had enough blankets and they never said they were cold. D.H. testified that the children were never left alone in the kitchen when the oven door was open—which, she said, was mainly during the night, when the family was asleep.[11]

Regarding her financial resources, D.H. testified that she had not worked since high school. She had not been able to get a job, she said, because she did not have a high school diploma or a G.E.D. Her mother J.H. also was unemployed. In 2000, when her children were living with her, D.H. received $400 a month in TANF (Temporary Assistance for Needy Families) benefits. The rent on the East Capitol Dwelling apartment, which D.H. paid, was around $100 each month.

At the conclusion of the fact finding hearing, the trial judge commented that "it must be embarrassing" for the District to seek a finding of neglect when "there is such devastating evidence that the District of Columbia itself is responsible for some of the atrocious conditions" in the home. The judge took into account that some of those conditions, such as the broken plumbing and refrigerator, the lack of heat, and the rotting floor, were beyond D.H.'s control and hence were not, in themselves, a reason to find the children neglected. The judge also noted the absence of evidence that the H. children had been damaged. Nevertheless, relying

10. For example, D.H. flatly denied that there were feces on the floor when Officer Perry visited her apartment on June 29. D.H. did admit, though, that Ms. Kellerhouse saw feces on her living room floor.

11. After the children were removed from D.H.'s home, they went to live with her sister. D.H. maintained regular contact with the children and attended to their medical care, schooling, and similar matters. The children were in good health, doing well in school, and evidently having their needs met.

most heavily on the testimony of Ms. Kellerhouse and Officer Perry while giving less weight to the testimony of Ms. Norris and D.H., the judge entered findings of neglect. The judge concluded that D.H. and J.H. bore at least some of the responsibility for allowing the children to live in deleterious conditions and that this was not due to their lack of financial means.

Specifically, the judge found, the children were "routinely exposed to health risks" from conditions in the H. family home that were indeed deplorable notwithstanding D.H.'s denials. "This was not," the judge stated, "a one time thing." The children "lived in and around human fecal matter, roaches, old and rotting food and trash in their home"; they lived in "a home that at times did not have working heat or plumbing"; and they were "exposed to risk of serious injury by the oven in the premises being left on with the oven door open for extended periods" throughout the winter.[12] These circumstances "became part of the lifestyle" of the H. family.

It was "beyond dispute, in my judgment," the judge stated, "that many of the conditions in which Miss H. and her mother and her children were living were not conditions over which they had control."[13] Nevertheless, this was "a situation where a combination of circumstances, some not caused by Miss H. or her mother, but others clearly caused by them, put these children at risk." D.H. and J.H., the judge found, "permitted these deplorable conditions of the home to occur and to continue by not making efforts to keep food away from roaches, pick up the trash or keep the premises free from fecal matter; they could have addressed the conditions but chose not to." Reviewing D.H.'s testimony, the judge found that she "appeared either unaware, uncaring, or both regarding the deplorable conditions in which she and her children were living." The judge did not arrive at this conclusion lightly; he was both troubled and perplexed by the "strange nonchalance" that D.H. displayed when confronted about the unsafe and unsanitary environment in the home:

> She just didn't think it was a matter of any concern. And that is a very troubling demonstration of the misjudgment

12. In citing the use of the oven to heat the apartment, the judge acknowledged that he gave "lesser weight to that factor ... because it [was] not a problem over which Miss H. had much control":

> She was making a very hard decision.... She needed heat for her children. And the District of Columbia, for whatever reasons, took it upon itself not to make the necessary repairs that would have provided heat to this premises. And so Miss H. was doing the best she could. And so it's much harder to find that an indicia of neglect. I suppose that the answer is that she should have made much more vigorous efforts to find another place. But, again, given her limited financial means, that was very difficult.
>
> So, that factor is of great concern to me in terms of its risk to the children. But it may be that given the defalcations by the

District of Columbia and the limited financial means of Miss H., that that is not as appropriate a factor for the Court to consider and it certainly is not a factor which has been dispositive in the Court's decision.

13. The judge noted the several respects detailed by Ms. Kellerhouse in which "the Housing Authority was deficient and not doing [its job]: replacing the refrigerator, replacing the hot water heater, replacing the floorboards, monthly exterminations, fixing the heating system, replacing the screen door, replacing the cabinets under the sink in the kitchen, professionally cleaning and painting the interior." And, the judge added, "to the extent that the problems these children were experiencing were the product of those circumstances, I want to make the record clear that I don't believe that situation is the fault of Miss H. or her mother."

by her that, again, puts these children at serious risk.... [T]his nonchalance was strange because Miss H. has not shown herself in other respects to be an uncaring parent.... [T]his is a lady who has assiduously taken it upon herself to keep abreast of what's going on with her children.... She is somebody who clearly loves and cares for her children.... There's no evidence that the children have been physically injured or abused....

But there is this blind spot ... that Miss H. seems to have about the conditions in which you live and how they contribute or don't contribute, or how they hurt a child's welfare. And ... she has this attitude of almost nonchalance about these matters which, it seems to me, objectively just put these children at serious risk.

In finding that the critical deprivations in this case were not due to D.H.'s lack of financial means, the judge took several factors into account. He cited the facts that D.H. received TANF benefits for her children and that her housing was subsidized. He also concluded that, while D.H. had a history of unemployment, she was able to work. D.H. had an eleventh grade education, she was a "reasonably articulate, intelligent person," and she displayed "no obvious mental or emotional deficiencies." The judge did not believe that D.H. had made "any honest, sincere effort to find work over this long period when she hasn't even had to worry about caring for her children...." Nor, the judge thought, had she made a serious effort to obtain her G.E.D. D.H.'s lack of initiative undermined her claim that the deplorable conditions in her home were due to a lack of financial means.

Setting aside such factors, however, the judge noted that "it's not lack of financial means that have contributed to, for example, the continuous and routine presence of fecal matter and trash on the floors of this house and the exposure of children to that, the children running around naked and without footwear in the house. These are all things that could have been taken care of aside from any limited financial circumstances."

Based on the foregoing findings, the judge concluded that the respondent children were neglected within the meaning of D.C.Code § 16–2301(9)(B), in that they lacked proper parental care and control necessary for their physical health, and this deprivation was not due to their parent's lack of financial means.

II.

D.H. contends that insufficient evidence was presented in the fact finding hearing to sustain the judge's ruling that her children were neglected. What D.H. calls "the lack of cleanliness of the home" and "a mere threat of physical harm" did not constitute, she argues, a serious enough deprivation without more to support the ruling, especially in view of evidence that the District of Columbia Housing Authority itself was responsible for the debilitated and dilapidated state of the premises. More pointedly, given her conceded poverty, her reliance on subsidized housing, and the Housing Authority's alleged defalcations in providing that housing, D.H. also argues that the District of Columbia failed to carry its burden of proving that the deplorable conditions in her home were not attributable to her lack of financial means. D.H. finds support for her arguments in *In re T.G.*, 684 A.2d 786 (D.C.1996), the only previous published decision of this court to consider a neglect petition predicated on the existence of deplorable living conditions comparable to those in this case. The court was divided in *T.G.*, but the majority reversed the adjudication of ne-

glect because, it concluded, the government had not met its burden of proof.

We are not persuaded that *T.G.* controls our decision in this case or that there was insufficient evidence to sustain the finding of neglect here. In our view, the trial judge sensitively weighed the evidence and correctly applied the law, and we affirm his judgment. D.H. does raise serious issues that merit exploration, however. "Deplorable conditions" cases in general and the statutory "lack of financial means" proviso in particular have proved problematic in practice, and like the trial judge, we cannot ignore or minimize the extent to which D.H.'s poverty and forces beyond her control helped create the circumstances in which she and her children lived.

## A.

■■■ Certain well-settled principles of law govern the scope of our review in this appeal. The District of Columbia bore the burden of proving neglect in all its elements by a preponderance of the evidence—nothing greater. *See* D.C.Code § 16–2317(b)(2), (c)(2)(2001); *In re M.D.,* 758 A.2d 27, 31 (D.C.2000); *In re E.H.,* 718 A.2d 162, 168 (D.C.1998). In evaluating on appeal whether the District shouldered that burden, "we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as trier of fact, to determine credibility, weigh the evidence, and draw

reasonable inferences." *In re S.G.,* 581 A.2d 771, 774 (D.C.1990) (quoting *In re T.M.,* 577 A.2d 1149, 1151 (D.C.1990)). "Deference is due to the trial court's determination of abuse or neglect and we will not 'second-guess the trial judge on a very difficult call.'" *In re C.C.J.,* 777 A.2d 265, 269 (D.C.2001) (quoting *S.G.,* 581 A.2d at 780).

■■■ There is an overarching consideration that guides, and at times tempers, our deference to trial court adjudications in this area. This court will assess whether the evidentiary inquiry in the trial court was adequate to permit a truly informed decision, and if the inquiry was superficial, we may remand for further proceedings. *See M.D.,* 758 A.2d at 34. The neglect statute is "a remedial enactment designed to protect the welfare of neglected and abused children, and it must be liberally construed to achieve that end." *In re T.W.,* 732 A.2d 254, 258 (D.C.1999). The court acts in a neglect proceeding as *parens patriae* and has the "paramount" obligation and "broad authority" to protect the best interests of the child where the parent is unwilling or unable to do so.[14] *Id.* To fulfill its obligation, the court has a duty to learn "'as much as possible about the entire situation'" before it. *M.D.,* 758 A.2d at 33 (quoting *In re J.A.,* 601 A.2d 69, 76 (D.C.1991)). "'[T]he trial court's inquiry must go beyond simply examining the most recent episode.'" *Id.* (quoting *In re A.S.,* 643 A.2d 345, 347 (D.C.1994).[15] A

---

**14.** State intrusion in the parent-child relationships is, presumptively, a last resort. It is not something to be indulged on account of trivial or insubstantial concerns. Parents have a due process right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). "[T]he constitutional presumption against state intervention exists," however, "only 'so long as a parent adequately cares for his or her children.'" *Newby v. United States,* 797

A.2d 1233, 1244 (D.C.2002) (quoting *Troxel,* 530 U.S. at 68). In the final analysis, the state has the right and duty to protect minor children through judicial determinations of their interest. *See Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

**15.** "We have directed the trial court in neglect proceedings to consider the 'entire mosaic' of the child's history and experience relevant to the allegations of neglect." *Id.;*

snapshot may be vivid and evocative, and sometimes it may suffice, but usually it is an unsatisfactory basis on which to make the important judgments required in a neglect proceeding.[16]

### B.

■■ A child is neglected within the meaning of former D.C.Code § 16–2301(9)(B) if the child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian." Where such deprivation is established, this definition does not require proof that the child has already sustained actual injury as a result. *See, e.g.,* *T.G.,* 684 A.2d at 789 (intervention may be justified by "danger to the physical or emotional health of a child, or the significant threat thereto"); *accord, S.G.,* 581 A.2d at 780. Other definitional provisions of the neglect statute dispel any remaining doubt on this score. Under former § 16–2301(9)(F),[17] a neglected child includes one "who has received negligent treatment or maltreatment from his or her parent, guardian, or other custodian." As used in that subparagraph, the terms "negligent treatment" and "maltreatment" are defined to mean simply the "failure to provide adequate food, clothing, shelter, or medical care" (so long as the deprivation is not due to a parental lack of financial resources). D.C.Code § 16–2301(24).[18]

If, therefore, for reasons other than financial constraints, a parent maintains an unsanitary or unsafe home environment that endangers the physical health or well being of her child, the child may be found to be neglected. This court's decision in *T.G.* does not suggest otherwise, even though it did reverse neglect findings that were based on the existence of deplorable home conditions much like those found in the present case. The majority in *T.G.* did not dispute that "constant exposure to filthy living conditions creates the risk of physical deterioration" and that "we don't need to leave children in deplorable conditions until they get hurt...." 684 A.2d at 789 & 789 n. 5. The *T.G.* majority simply was troubled by the fact that the neglect petitions before it were predicated on nothing more than a single snapshot of the family's existence—the deplorable living

---

see also *T.G.,* 684 A.2d at 788 ("[T]he 'entire mosaic' includes an examination of any history of, but also the reasons for, neglect—*i.e.,* chronic indifference, carelessness, dereliction, inability to perform, etc.").

16. The Corporation Counsel "shares *parens patriae* responsibilities to the child with the court," *M.D.,* 758 A.2d at 34 n. 12, and it is the Corporation Counsel's responsibility in the first instance to take the trouble to investigate the overall family situation and present an adequate evidentiary picture. This burden, which we do not minimize, is commensurate with the gravity of the petition for intervention in the lives of parent and child that the Corporation Counsel files. Counsel representing other parties in the neglect proceeding, especially the guardian *ad litem* appointed by the court to represent the child,

share this burden. In the end, though, if the parties do not shoulder their burdens, the court "ought not to be passive in the face of what it recognizes is a deficient presentation of evidence. In such a case the court may and should take affirmative steps to ensure that it has enough evidence before it to make an informed decision." *Id.* at 34.

17. Renumbered as D.C.Code § 16–2301(9)(A)(vi); see footnote 1, *supra.*

18. It certainly would seem that the CFSA could have alleged that the respondents in this case were neglected within the meaning of subparagraph (9)(F). No reason appears why CFSA did not proceed under (9)(F) in addition to subparagraph (9)(B), except that it might have been deemed duplicative.

conditions at issue in the case had been observed on only one, possibly uncharacteristic, day, and there was no evidence (or so the majority concluded) that those conditions were other than temporary or that the parents tolerated them.[19]

The focus in the instant case was not so narrow. The allegations of neglect were not based in this case on a mere snapshot. The District presented credible evidence that deplorably unsanitary and unsafe living conditions were allowed to persist in the H. home over a period of several months at least. Crediting the testimony of Ms. Norris, Ms. Kellerhouse, and Officer Perry, as the judge was entitled to do, he readily could find, as he did, that the health and safety of the respondents were jeopardized. The ever-present filth; the lack of heat, refrigeration, and plumbing; the reliance on the oven to warm the apartment, coupled with D.H.'s "nonchalant" attitude toward these problems—exposed these small children to substantial risks of serious harm. The judge also could find, as he did, that the foregoing deleterious conditions in the home were attributable not only to the failings of the Housing Authority but also to what the *T.G.* majority called "chronic indifference, carelessness, dereliction, [and] inability to perform" on the part of D.H. and J.H. *Id.* at 788. These findings, all amply sup-

ported by evidence in the record, are not subject to serious attack on appeal.

That brings us to the remaining issue— whether there was sufficient proof that the deprivations in this case were not due to D.H.'s lack of financial resources.

## C.

The statutory requirement that the government prove that "the deprivation is not due to the lack of financial means" of the parent, guardian or custodian has proved to be nettlesome in both theory and practice. In part this is because the government is charged with proving a negative where the pertinent information is largely in the possession of the opposing party. We shall address that problem in due course. There is also a threshold interpretive issue: is the deprivation "due to" parental poverty if that poverty is only one of several factors that in combination cause the parent not to provide proper care? That issue need not detain us long. When a case, like this one, presents multiple deprivations, some due to lack of financial means and some due to other factors, the statute requires that the neglect determination be based on the factors not attributable to the lack of financial means. *See* D.C.Code § 16–2301(9)(B). Unless the exception for poverty is to swallow the rule and threaten to nullify the neglect statute, proof that other causes

---

**19.** "The problem in this case arises," the majority said, "as a result of DHS's immediate focus on the conditions in two residences *on a particular day....* Not enough focus, however, was centered on the physical or mental condition of the children *overall.*" *Id.* at 789 (emphasis added). *See also id.* at 793 (King, J., dissenting) ("The majority seems to be saying that neglect was not established because it was only shown that the children and their homes were filthy on a single day in their lives."). As the majority opinion explained, the children were taken into protective custody "on the same day ... that their

ailing grandmother died, and that their living quarters were observed.... All of the evidence as to parental housekeeping or child care was gathered on that one day ... and a neglect petition was filed on the following day." *Id.* at 788–89.

As we discuss *infra*, notwithstanding the foregoing concerns, the majority reversed the neglect adjudications in *T.G.* for a different reason, namely, the absence of proof that the deplorable conditions in the home were not due to the parents' lack of financial means. *See id.* at 790–91.

operated together with poverty must be sufficient to meet the government's burden of proof. *Cf. Majeska v. District of Columbia,* 812 A.2d 948, 951 (D.C.2002) (" '[T]he actor's negligent conduct is a legal cause of harm to another if ... his conduct is a substantial factor in bringing about the harm.' "); *Prezzi v. United States,* 62 A.2d 196, 198 (D.C.1948) (affirming liability if specific conduct of an actor directly caused a harm, regardless of other negligence that concurrently produced the harm). As a corollary, if the parent has the ability, with reasonable effort, to overcome the effects of her poverty, the deprivation is not "due to" the parent's lack of financial means.

■ On a more fundamental level, though, the purpose of the financial means proviso is obscure; indeed, a palpable tension exists between that proviso and the remedial purposes of the statute as a whole. To be sure, family poverty is not a reason, in and of itself, to find a child neglected, even if it plausibly could be argued that the child's best interests would be served by removal to a materially wealthier home. The financial means proviso is puzzling because it appears to mean more than that. If a child is deprived of parental care "necessary" for his physical health—for example, if the child is malnourished, not properly clothed, or denied medical care—why should the reason for the deprivation matter in deciding whether the state should be allowed to intervene and protect the child? The neglect proceeding is not punitive; "[t]he relevant focus for the court under § 16–2301(9)(B) is the children's condition, not the [parent's] culpability." *In re B.C.,* 582 A.2d 1196, 1198 (D.C.1990). Nor does state intervention necessarily mean that the parent will lose custody of the child; services may be provided to the child in the family home. Why then should it matter whether

the parent's inability to care for the child is due to financial as opposed to other reasons?

■ Clear answers to the foregoing questions are not to be found, so far as we are aware, in the legislative history of the law or past opinions of this court. The premise seems to be, though, that when it is poverty alone that causes an otherwise fit parent to be unable to care for her child, adequate public or private benefits should and will be made available to the family—benefits that the parent can be counted on to put to good use to remedy the child's deprivation, thereby rendering a formal neglect proceeding unnecessary. The facts of the present case may engender skepticism about the validity of that premise, but if the premise is valid, it suggests two ways by which the Corporation Counsel can meet its burden in a neglect proceeding of proving that a deprivation is not due to a parental lack of financial resources.

■ First, the Corporation Counsel can present affirmative evidence, or it may be self-evident, that the deprivation is due to reasons other than the parent's lack of financial means. We acknowledged as much in *In re D.C.,* 561 A.2d 477 (D.C.1989), where the trial court found that a mother had neglected her thirteen-month-old baby by leaving him alone with his nine-year-old brother while she went shopping despite indications that the brother had abused the baby physically six months earlier. In the mother's absence, the baby sustained first-and second-degree burns from contact with a space heater. "There may be instances," we said, "in which the neglect is completely unrelated to the financial status of the parent, as in the instant case, and it would seem perfectly proper [in such instances] for the government to meet its burden to prove lack of proper care and control

without also providing an affirmative showing of the parent's financial status." *Id.* at 479. In other words, where there is no "nexus between the act underlying the ultimate finding of neglect and the mother's financial circumstances," *id.*, it is plain enough without the need for other evidence that the deprivation is due to reasons other than a lack of financial means. "In such circumstances, once the government has presented a prima facie case, the burden of production would shift to the parent to show that financial deprivation is related to the neglect." *Id.* The caveat we would add is that our opinion in *D.C.* should not be read to imply that the deprivation visited on the child must be "completely unrelated" to the parent's lack of financial resources. For the reasons we offered earlier, it should be enough if the evidence shows that parental poverty was not the only or the "but for" cause.

▮▮▮ Alternatively, the Corporation Counsel may present evidence that the parent had, or had available, sufficient financial resources to enable her to care properly for her child. This could take the form of evidence that the parent was receiving or was eligible to receive public assistance and other benefits that she reasonably could have been expected to use to remedy the deprivation in question. In the area of public assistance and private charitable benefits, the government has the expertise and the data it needs to make such a showing. This court endorsed such an approach in *In re W.T.L.,* 825 A.2d 892, 893 (D.C.2002), when we held that "appellant's receipt of food stamps and TANF and Medicaid benefits was sufficient to establish that appellant's failure to provide for the child was not due

to lack of financial means, thus satisfying the definition contained in D.C.Code § 16–2301(9)(B)." Again, a caveat is in order. In some cases it may be too facile for the government merely to show that some financial assistance was provided to the parent; it must also appear, and not just be presumed, that the financial assistance was truly enough in the circumstances. The government should be able to make that case.

In *T.G.,* the majority held that insufficient evidence was presented to show that the deplorable living conditions in question were not caused by the family's lack of financial means. *Id.* at 790. It is important to appreciate why the majority reached that conclusion. To begin with, family poverty was implicated strongly by the evidence. The majority opinion speaks, movingly, of the "problems of substandard housing" and "the stark realities of poverty in an urban dwelling." *Id.* at 789–90. "The [trial] court's findings reflected mostly the almost unspeakable poverty in which the family subsisted *without the assistance of aid payments from the District.*" *Id.* at 790 (emphasis added).[20] Most significant, perhaps, was the fact that no evidence was presented showing how long the deplorable conditions had lasted or that the parents were at fault in perpetuating them. The conditions were "observed by witnesses on one day of tragedy," *id.* at 790; everything else was left to speculation. Thus the District did not present evidence in *T.G.,* nor did the majority find it self-evident, that the deplorable residential conditions were attributable to factors other than the family's poverty. And the District did not present evidence that the family had available sufficient financial resources to enable the

---

**20.** The father reportedly "used borrowed funds to bring home food every day.... [and] the only family income came from a social security check, payable to the mother's father, who in turn gave the mother a certain amount of the funds for her use." *Id.* at 789.

family to grapple effectively with the substandard housing and attendant conditions that they confronted.[21]

The present case is different. Like the trial judge, we are not blind to the role that poverty and forces beyond D.H.'s control played in her family's life. Nevertheless, we are persuaded that unlike in *T.G.*, the judge here did have a substantial evidentiary basis for his finding that the principal unsafe and unsanitary conditions in the H. family home were not due to a parental lack of the financial means to remedy them.

On appeal the District argues that it met its burden simply by presenting evidence that D.H. was receiving $400 per month in TANF benefits—funds that she needed to use to support a family group of two adults (D.H. and her mother J.H.) and five children. "While it is true that this is not an abundant amount of support," the District argues with understatement, "the amount is determined under a schedule established for this size family by the District of Columbia Council[22] . . . and should have been sufficient to maintain the family's public housing unit in a habitable condition." The District adds that the TANF payment should not have been the only support the H. family received, because the family also would have been entitled—though no evidence was presented on this score—to other public benefits, including food stamps, medical and employment assistance, in addition to its subsidized public housing.

By itself, this evidence strikes us as pertinent but incomplete, inasmuch as it is unaccompanied by any analysis of the H. family's actual economic needs. On the other hand, D.H. did not present any evidence to rebut the inference that the public assistance she received was adequate. To the contrary, she claimed to be able to support her family—to clean, to do laundry, to buy food, to pay her rent, and so forth. And there was no evidence that her children were malnourished or unhealthy (though there were indications that they were ill-clothed).

We find it unnecessary to decide whether the financial evidence alone sufficed to prove that the deprivations in this case were not due to lack of financial resources. We think the District met its burden of proof for a different reason, the one on which the trial judge placed his primary reliance.[23] Without belaboring the point, it is clear to us that the judge could find that D.H.'s long-term failures to exert herself to keep feces off the floor, to dispose of rotten food and other trash, to clean the kitchen, and to complain and demand that maintenance and repairs and exterminations be performed properly were not caused by D.H.'s lack of money. As in *D.C.*, there was no "nexus between the act[s] underlying the ultimate finding of neglect and the mother's financial circumstances." 561 A.2d at 479.

### III.

We will not pretend to think this was an easy case for the trial judge to decide, but his judgments were supported by the evi-

---

**21.** Even so, the question before the court in *T.G.* was a close one, given the inferences that arguably could be drawn (as the dissenting opinion made clear), but the reasons why the majority concluded that there was a failure of proof have been identified.

**22.** *See* D.C.Code § 4–205.52 (2001). The District states that the assistance schedule is re-

viewed and adjusted annually to "ensure" that the payment is comparable with monthly assistance provided in Maryland and Virginia. *See* D.C.Code § 4–205.51a (2001).

**23.** We do not rely on the findings by the trial judge regarding D.H.'s lack of initiative in obtaining gainful employment.

dence and we see no reason to reverse them. This is not a situation in which the judge charged D.H. and her mother with the failings of others. The judge did not ignore or discount the responsibility of the Housing Authority for the substandard condition of the public housing in which the H. family resided. The judge acknowledged the circumstances against which D.H. and J.H. had to struggle. There is no question that D.H.'s impoverishment made her task as a parent harder. Nonetheless, there was compelling evidence that D.H. and J.H. allowed deplorably unsafe and unsanitary conditions to persist indefinitely in their home, that this was not for lack of financial means to rectify the conditions, and that those conditions exposed the respondent children to serious health hazards. The judge therefore had a duty to protect the children's best interests by finding them neglected, as he did. We affirm the judgment on appeal.