## VI.

Accordingly, the judgment of the trial court is

*Affirmed.*

**In re K.M.; L.M., Appellant.**

**No. 11–FS–1234.**

District of Columbia Court of Appeals.

Argued Sept. 6, 2012.
Decided Sept. 12, 2013.

Laurie P. McManus for appellant.

Stacy L. Anderson, Assistant Attorney General for the District of Columbia, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Mindy Leon, Guardian ad Litem for appellee K.M., filed a statement joining the brief of appellee District of Columbia.

Jack S. Gilmore, counsel for C.H., father of K.M., filed a statement that a brief would not be filed on behalf of appellee C.H.

Before WASHINGTON, Chief Judge, McLEESE, Associate Judge, and BELSON, Senior Judge.

McLEESE, Associate Judge:

After an evidentiary hearing, a magistrate judge found that K.M., who was twelve years old at the time, was a neglected child. More specifically, the magistrate judge found that K.M.'s mother, appellant L.M., suffers from a delusional disorder of persecutory type, and that this mental illness has harmed K.M.'s mental and emotional health. The finding of neglect was affirmed by the reviewing judge. On appeal to this court, L.M. argues that the evidence does not support the determination that K.M. is a neglected child. We agree with L.M. and therefore reverse.

## I.

### A.

The following evidence was adduced at the evidentiary hearing. In September 2010, the D.C. Child and Family Services Agency ("CFSA") received a hotline report raising concerns about L.M.'s mental health. CFSA investigator Guillermo Cintron and CFSA social worker Meghan Snyder met with L.M. and K.M. in their home. Mr. Cintron explained D.C. law regarding child abuse and neglect to L.M., and reviewed the allegations against her. Mr. Cintron found L.M. to be "very calm" and "very organized." L.M. showed Mr. Cintron around the apartment, and he determined that the home was clean, neat, and adequately stocked with food. L.M. denied the allegations against her, but Mr. Cintron remained concerned about her mental health in light of L.M.'s expressed concerns that a group of people were "following her and doing different things to her." While Mr. Cintron spoke with L.M., Ms. Snyder interviewed K.M. in a separate room. After completing a home assessment and determining that the situation was safe for K.M., Mr. Cintron and Ms. Snyder left the home.

Approximately one week later, CFSA received another hotline report concerning K.M. Mr. Cintron immediately went to K.M.'s school. After discussing the allegations with K.M., Mr. Cintron decided to remove K.M. from L.M.'s custody immediately and to place him in foster care.[1]

---

1. Mr. Cintron testified that K.M. stated during the interview that his mother had threatened to hurt him, that he was afraid to go home, and that his mother was mumbling and telling him to be quiet even when he was not speaking. Evidence about these statements was admitted solely to explain CFSA's actions, not for the truth of what was said or for any other purpose. No evidence was introduced at the evidentiary hearing that L.M. in fact ever threatened K.M. Thus, the testimony about K.M.'s statements during this interview cannot be treated as substantive evidence either that K.M. had claimed that his mother had threatened him or that in fact she had done so.

The dissenting opinion acknowledges that Mr. Cintron's testimony was not admissible to prove that K.M.'s mother had ever threatened K.M., but expresses the view that Mr. Cintron's testimony should properly have been admitted as evidence of K.M.'s state of mind towards his mother. *Infra* at 238–39 n. 2, 242 n. 7. Neither before the reviewing judge nor in this court, however, did the District raise the contention that the magistrate judge erred in limiting the use to which Mr. Cintron's testimony could be put. In the absence of such a contention, we decline to decide the unbriefed question whether Mr. Cintron's testimony should have been admitted for broader purposes. We agree with the dissenting opinion to this extent, however: if the District of Columbia were to file a new neglect petition and were to seek to introduce testimony from Mr. Cintron, the magistrate judge should be free to consider whether Mr. Cintron's testimony about K.M.'s statements could properly be admitted for purposes beyond showing the effect of those statements on CFSA's actions, such as shedding light on K.M.'s state of mind towards his mother.

During the interview, K.M. appeared fearful to Mr. Cintron. Unable to reach L.M. at home, Mr. Cintron left a letter at the front desk of L.M.'s building to inform her of K.M.'s removal. Later that evening, Mr. Cintron received a very angry call from L.M., during which L.M. expressed deep suspicion of Mr. Cintron. According to Mr. Cintron, L.M. called him a liar, accused him of being part of the group of people who were "out to get her," and said that he was "part of the conspiracy" against her.

Ms. Esther Song was K.M.'s social worker after he was placed in foster care. Ms. Song testified that, starting a month or so after K.M. was placed in foster care, she observed K.M. occasionally misbehaving at school and in the car when Ms. Song drove him places. On one occasion, when Ms. Song refused K.M.'s request for a meal while they were driving to his foster home, he started throwing trash at her. During this same car trip, K.M. tried unsuccessfully to open the car door at a stop light and get out of the car. When he was unable to do so, he punched Ms. Song's arm while she was driving and said he was planning to punch her in the face. Ms. Song spoke with L.M. about K.M.'s behavior in the car, but K.M. and L.M. both accused her of lying. On another day when Ms. Song was driving K.M. to a supervised visit with L.M., K.M. began banging on the window after Ms. Song refused to put the window down. Ms. Song warned K.M. that if he tried to damage the car or made her feel unsafe or uncomfortable, she would not be able to drive him places. K.M. said that she was not allowed to stop his visits, but Ms. Song explained that another social worker would have to transport him. When they arrived at their destination, K.M. told L.M. that Ms. Song was trying to prevent their visits, that Ms. Song was evil, and that Ms.

Song was part of a North Korean invasion of America.

Two expert witnesses testified. First, psychiatrist Dr. Susan Theut testified as an expert in child, adolescent, and adult psychiatry. After interviewing L.M. as part of a court-ordered psychiatric evaluation, Dr. Theut provisionally diagnosed L.M. as suffering from "delusional disorder persecutory type." Dr. Theut described this disorder as involving irrational and firmly fixed beliefs that one "is being harmed by others or other people mean to hurt [ ] or persecute [one]." During Dr. Theut's interview with L.M., Dr. Theut observed that L.M. was "preoccupied with the fact that some people called the Smalls and the Tuckers have been following her ... [and] that they mean to hurt her, that they have gone through her belongings, stolen things from her." L.M. told Dr. Theut that the Smalls and the Tuckers had pursued her in Georgia, Maryland, and now in Washington D.C., and had been out to get her since at least 1998. L.M. also told Dr. Theut that K.M. was taken away from her by CFSA because she had sued the United States government. Dr. Theut explained that her diagnosis was provisional because she had no "collateral information" to support her diagnosis. In particular, Dr. Theut lacked L.M.'s prior medical or psychiatric records, other information about L.M.'s medical history, and information from persons close to L.M. in the last ten years. Nevertheless, based on Dr. Theut's interview with L.M., Dr. Theut "felt [L.M.] really does have delusional disorder persecutory type."

Dr. Theut opined that a person with delusional disorder who did not obtain treatment would have an "extremely poor" ability to independently parent children. Dr. Theut explained that: (1) "there's always a concern about ... the behavior that can be driven by the delusions;" (2)

persons with delusional disorder are "always questioning other people's motives;" and (3) "children raised around people who have a delusional disorder become very scared and frightened . . . [and] often don't know who[m] to trust." When asked what effect a parent's persecutory-type delusions would or could have on a child, Dr. Theut stated that the child "could" become fearful of other people, and that the child "could end up with . . . a shared delusional disorder," where the child shares the parent's delusional beliefs and starts exhibiting the same kind of paranoid behavior. Dr. Theut further testified that there would be concerns about the child's ability to trust others, such as teachers, and whether the child could differentiate between delusions and reality. Dr. Theut stated that she thought reunification of K.M. with L.M. would be "very problematic" if L.M. did not seek treatment for her disorder. Dr. Theut noted that she had discussed treatment options with L.M., but that L.M. did not believe she needed treatment.

Dr. Theut acknowledged that it is possible for a person to suffer from a mental illness and adequately parent a child, and explained that the person's parenting ability would depend on the nature, extent, and severity of the mental illness. Dr. Theut also acknowledged that persons with delusional disorder can be "very functional except when the delusions intrude," and that such persons "can present sometimes in a normal way." Finally, Dr. Theut acknowledged that L.M. was cooperative during their interview and that Dr. Theut personally did not observe any impulsive behavior by L.M.

Psychologist Dr. Seth King testified as an expert in adult and child psychology and psychological assessments. Dr. King also conducted a court-ordered clinical interview with L.M., which resulted in a provisional diagnosis of delusional disorder of persecutory type. Dr. King testified that although L.M. was "well-groomed," "well-spoken," and "intelligent," she also spoke in a "tangential manner" and provided a great deal of extraneous information during their interview, which required Dr. King to frequently redirect her to the topics he asked her about. L.M. described in great detail how the Smalls and Tuckers had conspired against her for decades. L.M. told Dr. King that these individuals "were always working against her, trying to get her and her children." Dr. King explained that his diagnosis was provisional because he lacked corroborating information. Specifically, Dr. King said that it would have been helpful to have information from individuals who had known L.M. throughout her life, and Dr. King recommended that L.M. meet regularly with someone who could assess her over a length of time. Dr. King concluded that L.M. was in denial about her mental-health condition, and that L.M. whole-heartedly believed in her conspiracy theories, which made it unlikely that she would seek treatment for her disorder.

Dr. King opined, to a reasonable degree of clinical certainty, that if L.M. does not seek treatment, her disorder "will have a negative impact on her ability to appropriately and effectively parent K.[M.]" Dr. King stated that parents with delusional disorder "would be . . . impair[ed] in ability to parent a child in that the lack of insight [and] poor judgment could affect decision-making." Dr. King further explained that preoccupation with delusions "could interfere with [L.M.'s] ability to focus on the needs of the child . . . . [and] could interfere with [L.M.'s] ability to work collaboratively with others such as school personnel." Dr. King also testified that a parent suffering from delusional disorder could be "modeling" this behavior for a child, meaning that the child "could

adopt that way of thinking, that way of being distrustful." Dr. King further testified that having a delusional parent "could be frightening" or "confusing" for the child, and that the child "could . . . start believing that there are other people to talk to that are actually not there . . . [or] could eventually believe that the parent does have problems with reality . . . which could impact that child's ability to respect that parent or . . . that parent's authority." When asked whether there are "any potential long-lasting effects" on a child parented by an individual with delusional disorder, Dr. King responded that "[t]here could be various outcomes based on a parent exercising poor judgment, poor decision-making, not providing effective parenting, [and] not being able to focus on the needs of the child." Dr. King further indicated that these parental deficiencies "could lead to a host of problems such as the child being neglected in some way educationally . . .[,] adopting some of these thought processes . . .[,] not following directions, having a lack of structure [or] a lack of supervision. . . . [, or having] difficulty forming appropriate relationships . . . or understanding the societal expectations of relationships."

Dr. King acknowledged that individuals with delusional disorder are able to function in various areas of their lives that are not related to the object of the delusion. L.M. was cooperative during her interview with Dr. King, and Dr. King did not observe any impulsive behavior on her part. Dr. King also acknowledged that there are studies showing a low rate of violence among individuals with delusional disorder. Dr. King's primary concern about L.M. was not that she would engage in violence, but rather was with her "decision-making,

judgment, [and] things that could lead to neglect." Dr. King believed K.M. was at an age where his mother's delusional disorder "would have an impact on him."

Three witnesses testified on behalf of L.M. at the evidentiary hearing: her father E.M., her adult son D.G., and family friend Ms. Warlene Smith. E.M. spoke with and saw K.M. and L.M. regularly after they moved to the area and before K.M.'s removal. E.M. described the relationship between K.M. and L.M. as "normal," noting that K.M. and L.M. "got along pretty well." L.M. corrected K.M. verbally and did not do anything "out of the ordinary" to discipline K.M. L.M. had told E.M. about her belief that people were harassing her. E.M. did not know any of the people that L.M. had told him about, and he had advised her to get some kind of help to deal with the problem. L.M.'s son D.G. frequently spoke with K.M. on the phone. D.G. observed that K.M. seemed well cared for and appeared to be attending school regularly. K.M. never expressed a fear of L.M. to D.G. and never complained about physical discipline by L.M. Finally, Ms. Smith spoke frequently with L.M. on the phone, and K.M. visited her home once with L.M. During that visit, K.M. looked "good," "clean," and "healthy," and L.M. was "very protective" of K.M. and corrected him verbally when needed.[2]

The magistrate judge generally credited the testimony of all the witnesses, but determined that L.M.'s witnesses offered little information regarding the allegations of neglect. The magistrate judge also noted that L.M.'s love for K.M. and desire to provide proper care for him were evident.

2. L.M. initially sought to call K.M. as a witness on her behalf. After hearing testimony from Dr. Theut that testifying would likely cause harm to K.M., the magistrate judge determined that K.M. could not testify, but could submit a letter to the court, if he desired. K.M. did not submit a letter to the court.

The magistrate judge found by a preponderance of the evidence that K.M. was a neglected child. She based her findings on the mental-health experts' testimony that L.M. suffered from a delusional disorder and on the social workers' testimony regarding L.M.'s behavior, which the magistrate judge viewed as consistent with the experts' opinions. The magistrate judge also relied on the experts' opinions regarding L.M.'s parenting abilities and the effects that L.M.'s delusions could have on K.M. In particular, the magistrate judge identified K.M.'s aggressive and disruptive behavior with his social worker and at school as confirming the experts' prediction that exposure to L.M.'s delusional disorder would cause K.M. to adopt L.M.'s "maladaptive and paranoid beliefs and behaviors."

L.M. filed a motion seeking judicial review of the magistrate judge's order. The reviewing judge affirmed.[3]

## II.

 The District bore the burden of proving by a preponderance of the evidence that K.M. was a neglected child within the meaning of D.C.Code § 16–2301 (2001–2012). *See, e.g., In re E.H.*, 718 A.2d 162, 168 (D.C.1998). The scope of our review is circumscribed by D.C.Code § 17–305(a) (2001), which provides that a judgment "may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." *In re E.H.*, 718 A.2d at 168 (quoting D.C.Code § 17–305(a)). In assessing the sufficiency of the evidence,

we must "consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re A.H.*, 842 A.2d 674, 684 (D.C.2004) (internal quotation marks omitted).

This is a very unusual neglect case. There was no evidence of parental abuse or mistreatment, nor was there any evidence that L.M. had ever acted violently or threatened to do so. The District's witnesses testified that the family home was clean, neat, and well supplied with food. The magistrate judge credited testimony from family members that K.M. was well cared for, that K.M. was clean and healthy, and that L.M. was protective of K.M. and corrected K.M. appropriately. The evidence thus indicated that L.M. sufficiently met K.M.'s physical and material needs, and the magistrate judge specifically found that L.M. had not physically endangered K.M. Further, no expert testified that K.M. had in fact suffered any emotional or psychological injury as a result of his mother's illness. In nevertheless finding neglect, the magistrate judge concluded (1) K.M. was already suffering emotional and mental injury as a result of his mother's illness; and (2) in any event K.M. was at risk to suffer such injury in the future. We do not view the record as sufficient to support either basis for the finding of neglect.

## III.

 A child is neglected within the meaning of D.C.Code § 16–2301(9)(A)(ii) if

---

**3.** In affirming, the reviewing judge relied upon, among other things, the neglect complaint referral form, K.M.'s school attendance record, and K.M.'s report card. L.M. contends, and the District does not dispute, that the reviewing judge erred by relying on these documents, which were never admitted into evidence or considered by the magistrate judge. Accepting the District's implicit concession, we assess the sufficiency of the evidence based solely on the materials admitted into evidence before the magistrate judge. Although some of the additional information considered by the reviewing judge could have been quite relevant to the issue of neglect, we must decide the sufficiency of the evidence based on what was actually introduced during the evidentiary hearing.

the child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent." No finding of parental fault is required to establish neglect. *In re N.P.*, 882 A.2d 241, 250 (D.C.2005). The "relevant focus for the court . . . is the [child's] condition, not the [mother's] culpability." *In re E.H.*, 718 A.2d at 169 (internal quotation marks omitted; brackets in original). A child is neglected within the meaning of D.C.Code § 16–2301(9)(A)(iii) if the child's parent is "unable to discharge his or her responsibilities to and for the child because of . . . mental incapacity." Proof of mental incapacity alone is not sufficient; the government is required to "demonstrate the existence of a nexus between a parent's [ ] mental incapacity and an inability to provide proper parental care." *In re N.P.*, 882 A.2d at 251 (internal quotation marks omitted). In this case, the District's theory of neglect was essentially the same under both provisions: L.M.'s delusional disorder rendered L.M. unable to provide proper parental care for and control over K.M. We conclude that the evidence introduced at the evidentiary hearing in this case was inadequate to support that theory.

## A.

The magistrate judge based her finding of neglect on the conclusion that L.M.'s "modeling of paranoid and delusional beliefs and behaviors and [K.M.'s] adoption of these beliefs and behaviors, shows clearly that [L.M.'s] mental illness impairs her ability to discharge her parental responsibilities . . . and has had an adverse impact on [K.M.]" Similarly, District argues on appeal that, "because of her mental illness, L.M. was raising K.M. in an environment that endangered his emotional and mental

wellbeing." We therefore focus our inquiry on whether there is sufficient evidence in the record that, as a result of his mother's mental illness, K.M.'s emotional and mental health either had been harmed or was threatened with harm, to a degree permitting a finding of neglect.

## B.

■ The evidence does not support a conclusion that K.M. had already suffered mental or emotional harm as a result of exposure to L.M.'s delusional disorder. There was no evidence that an expert examined K.M. and found such harm to have occurred. Further, K.M. never testified, and the magistrate judge's neglect finding thus did not reflect her own observations of or interactions with K.M. In finding that K.M. had already suffered mental or emotional harm, the magistrate judge relied heavily on the testimony of K.M.'s social worker regarding K.M.'s behavior after K.M. was removed from his mother's care, viewing that behavior as evidence that K.M. was emulating his mother's delusions. Specifically, the magistrate judge stated that K.M. was "suspicious of school staff and of his social worker" and was engaging in "dangerous, hostile, and aggressive behavior that impair[ed] his functioning at school and caus[ed] him to engage in dangerous behavior like hitting his social worker . . . and accusing her of lying." The District additionally relies on the evidence that K.M. called Ms. Song "evil" and "part of a North Korean invasion."

We find this evidence inadequate to support a finding that K.M. had actually suffered mental or emotional injury as a result of his mother's illness. First, although Ms. Song testified that K.M. had in a few instances engaged in aggressive behavior, no evidence tied that behavior to

L.M.'s mental disorder. There was no evidence that L.M. ever engaged in aggressive or impulsive behavior, and Dr. King testified that people with delusional disorder are not typically violent. Further, the instances of aggressive behavior occurred a month or more after K.M.'s removal. It seems counterintuitive to attribute such behavior to the delayed influence of exposure to his mother's illness. If one were inclined to speculate about the causes of that behavior, it would seem more natural to speculate that the behavior might have reflected K.M.'s anger or hostility at being removed from what the magistrate judge found was a loving relationship with his mother. *See generally, e.g., In re Sabrina P.,* 2003 WL 360947, *1 (Cal.Ct.App. Feb. 19, 2003) ("When the children were first placed in foster care, Sabrina was very upset at being separated from her parents and had a difficult time adjusting...."); C. Huntington, *Familial Norms and Normality,* 59 Emory L.J. 1103, 1121 & n. 79 (2010) ("the experience of being removed from the home, even temporarily, can be deeply traumatizing"; citing social-science literature); M. Beyer, *Too Little, Too Late: Designing Family Support to Succeed,* 22 N.Y.U. Rev. L. & Soc. Change 311, 332–33 & n. 49 (1996) (both parents and children experience anger as result of separation; citing social-science literature).[4] In any event, the absence of any evidence tying the few instances of aggressive behavior to L.M.'s mental illness leaves us unable to uphold the magistrate judge's finding of neglect on this basis.

Second, the evidence also cannot reasonably sustain an inference that K.M. was adopting his mother's delusional beliefs or

had otherwise been emotionally or mentally injured by exposure to his mother's illness. There was no evidence at all supporting the magistrate judge's finding that K.M. had expressed suspicion of the staff at his school. Ms. Song did describe two incidents where K.M. may have expressed a "suspicion" of her, calling Ms. Song evil and accusing her of lying and being part of a North Korean invasion. Here too, both incidents occurred well after K.M. had been removed from his mother's care, at a time when it would be entirely natural for K.M. to be hostile to or suspicious of Ms. Song. Moreover, although the experts testified generally that children "could" model their parents' delusions, no witness testified that there was a connection between either of those two incidents and K.M.'s illness. Nor does either incident show an obvious connection to that illness. It is quite natural for a child accused of wrongdoing to respond by denying the accusation as a lie, and a single instance of such conduct hardly suggests incipient delusion or any other mental or emotional injury. The reference to a North Korean invasion gives us slightly more pause. If one were to infer that K.M. actually believed that Ms. Song was part of a North Korean invasion, that might reflect delusional thinking. The remark was a passing one, however, made in anger and quite naturally interpreted as a figurative slur rather than a reflection of an actual delusion. At least in the absence of expert testimony shedding more specific light on the point, we cannot find this isolated remark an adequate basis for a conclusion that K.M. was already suffering mental or emotional injury as result of his exposure to his

4. At a hearing held to determine whether K.M. would be permitted to testify during the neglect proceedings, the government elicited testimony from one of its experts, Dr. Theut, that K.M. was "sad and anxious" and "an- gry," and "very much want[ed] to reunite with his mom." Dr. Theut further testified that "through his aggression and his behavior in school, [K.M. is] acting [those feelings] out, showing us how he feels."

mother's illness. *Cf. In re A.H.*, 842 A.2d at 684–85 ("A snapshot may be vivid and evocative, and sometimes it may suffice, but usually it is an unsatisfactory basis on which to make the important judgments required in a neglect proceeding.").

█ Our conclusion that the evidence in this case was insufficient to establish that K.M. had suffered actual harm finds support in this court's prior neglect cases. Such cases necessarily turn on their particular circumstances, but this case is much closer to those in which the court has found the evidence insufficient than to any case in which the court has found the evidence sufficient. *Compare In re L.H.*, 925 A.2d 579, 582–85 (D.C.2007) (reversing finding of neglect for insufficient evidence; trial judge's inference that mother's mental-health condition rendered her unable to provide proper parental care and control rested on "too much speculation to support a finding of neglect," where judge heard no medical testimony to support that inference, but rather based inference primarily on one instance of mother slapping child and throwing child to the ground and on mother's previous mental-health problems, and where there was evidence that mother adequately provided for children's physical needs), *and In re Am. V.*, 833 A.2d 493, 499 (D.C.2003) (vacating adjudication of neglect based on drug addiction for insufficient evidence; concluding that although there was "some indication" that mother's drug problems may have contributed to neglect, evidence was insufficient to support finding, by preponderance of evidence, of "causal relationship between [the mother's] drug problem and the children's neglect"), *with In re B.L.*, 824 A.2d 954, 956 (D.C.2003) (concluding that evidence was sufficient to demonstrate that mother's alcoholism rendered her unable to provide parental care for child, where mother was verbally abusive to child when intoxicated, mother and child engaged in physical confrontations over her drinking, and child was "embarrassed, frightened, and withdrawn"), *and In re E.H.*, 718 A.2d at 170–71 (finding sufficient evidence of neglect where mother suffering from delusional disorder of persecutory type allowed delusional fears of toxic fumes to "dominate" two-year-old child's life; mother had been hospitalized for mental illness, slept with child on sixth-floor balcony, took child to emergency room for unnecessary testing on numerous occasions, kept windows of apartment open in all weather, kept dishes and food in living room, isolated herself and child from friends and family due to suspicions, and appeared incapable of dealing with child's special needs).

## C.

█ A finding of neglect does not require actual harm to the child; such a finding can rest on a risk of physical or emotional injury that has not yet occurred. *See In re A.H.*, 842 A.2d at 685. A finding of neglect, however, cannot be established simply because there is a bare possibility of future harm, no matter how insubstantial the risk or the possible harm. We think that the requisite showing was well expressed in *In re A.H.*, 842 A.2d at 686, which upheld a finding of neglect based on a "substantial risk of serious harm." *See also In re A.H.*, 842 A.2d at 685 ("intervention may be justified by danger to the physical or emotional health of a child, or the significant threat thereto") (internal quotation marks omitted). In this case, we find the evidence of risk of future harm presented to the magistrate judge insufficient.

The magistrate judge relied almost exclusively on the testimony of the government's expert witnesses—Dr. Theut and Dr. King—to conclude that there was a risk that K.M. would suffer emotional and

mental injury. The magistrate judge described the experts as having testified that a person with untreated delusional disorder "would have impaired parenting abilities" and "that the child would likely emulate the parent's delusions, and might adopt the delusions as the child's own beliefs." The District further contends that the experts testified that continued exposure to L.M.'s mental illness posed a "serious risk" that K.M. would exhibit "similar paranoid behavior, distrust, fear and becom[e] unable to distinguish between reality and ... delusions."

In fact, the experts provided largely conditional testimony regarding what "could" happen to "a child" (not K.M. specifically) of "a parent" (not L.M. specifically) suffering from a delusional disorder. Although Dr. Theut and Dr. King identified numerous specific harms that "could" result from being exposed to a parent with delusional disorder, they generally said nothing about how likely it actually was that such harms would befall either such children generally or K.M. in particular. Testimony that something "could" happen, however, is not sufficient to establish that it likely will, but rather instead at most establishes that it possibly might happen. *See, e.g., Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 101 N.W.2d 167, 170 (1960) (testimony regarding what "could" be indicates "only a possibility, rather than [a] probability"); *Ulmer v. Ackerman*, 87 Ohio App.3d 137, 621 N.E.2d 1315, 1319 (1993) (noting general rule that "speculative words or words of mere possibility such as could are insufficient to establish probability").

In almost every instance in which either expert offered a more definite opinion about the probability or likelihood of harm, the harm was described in broad and vague terms. Specifically, Dr. Theut opined that without treatment L.M.'s ability to parent K.M. is "very poor," and Dr. King opined that without treatment L.M.'s condition "will have a negative impact on her ability to appropriately and effectively parent K.[M.]" The only testimony that both identified a specific adverse impact and was expressed in terms indicating a likelihood of occurrence was Dr. Theut's testimony that children raised around people with delusional order become very scared and frightened and often do not know whom to trust. We have no doubt that having a parent with a mental illness could be frightening at times, just as it surely could be frightening to have a parent suffering from a grave physical condition. Under our law, however, the mere fact that a parent has a mental illness does not by itself suffice to support a finding of neglect. *In re E.H.*, 718 A.2d at 169. It follows that, without more, a child's natural fear of such conditions would not normally be an adequate basis for a finding of neglect. And without some further evidence about gravity and more concrete implications, Dr. Theut's generalized reference to trust issues does not suffice to support a finding of neglect.

We conclude that the expert testimony in this case, which consisted almost entirely of speculation about what "could" happen and general statements of concern about the parenting abilities of persons with delusional disorders, did not suffice to establish the substantial risk of serious injury necessary to support a finding of neglect based solely on a risk of future harm.[5] Although this court does not ap-

---

5. To the extent that the District argues that a finding of neglect could rest on the fact that L.M., after K.M. was removed from her custody, treated social workers with suspicion and hostility and apparently did not understand the reasons for K.M.'s removal, we find this argument unconvincing. Having lost custody of her child, it is unsurprising that L.M. dis-

pear to have squarely addressed a case in which a finding of neglect was based solely on threatened emotional or mental harm to the child, we do take guidance from our cases addressing the threat of physical harm. Here too, this case seems far more comparable to those in which the evidence was deemed insufficient than to those in which the evidence was deemed sufficient. *Compare, e.g., In re A.B.*, 999 A.2d 36, 44–48 (D.C.2010) (reversing finding of neglect as to siblings of abused child, who themselves had been subjected to "excessive corporal punishment," explaining that "finding of imminent danger [of being abused] does not necessarily follow from the fact that a sibling has been abused") (brackets in original) *with, e.g., In re A.H.*, 842 A.2d at 682, 686 (upholding finding of neglect based on "substantial risks of serious harm," where, for extended period, home was filled with human fecal matter, roaches, rotting food, and other garbage, and gas oven was left on with door open, while children played nearby). Further, courts in other jurisdictions have reversed adjudications of neglect in circumstances comparable to those of this case. *See, e.g., In re M.R.F.*, 246 Or.App. 302, 266 P.3d 116, 122–23 (2011) (reversing trial court's finding of child endangerment based on potential emotional harm resulting from exposure to mother's substance abuse, noting "Undoubtedly, mother's substance abuse problems have had, and will continue to have, an effect on … the children…. [Their] circumstances are less than ideal, but they are not inherently or necessarily more harmful or dangerous than other circumstances that would, by no stretch of the imagination, justify state intervention into the parent-child relationship.") (internal quotation marks and brackets omitted); *S.S. v. Department of Children Families*, 81 So.3d 618, 621–24 (Fla.Dist.Ct.App.2012) (reversing trial court's adjudication that children were at risk of imminent abuse and neglect based on, among other things, mother's psychological instability, where there was no testimony that children were poorly cared for or suffered any harm and no testimony establishing likelihood that mother's psychological issues would "substantially impair … [children's] physical, mental, or emotional health") (brackets in original); *In re David M.*, 134 Cal.App.4th 822, 829–30, 36 Cal.Rptr.3d 411 (2005) (reversing trial court's order declaring children neglected based on, among other things, mother's substance-abuse problem and both parents' mental-health issues; noting "The record … lacks any evidence of a specific, defined risk of harm to either [child] resulting from mother's or father's mental illness, or mother's substance abuse. Certainly, it is possible to identify many possible harms that *could* come to pass. But without more evidence than was presented in this case, such harms are merely speculative.").[6]

## IV.

■ Important and opposing interests are at stake in neglect proceedings. On the one hand, "in reviewing the evidence, we … must keep in mind that the neglect

---

played anger towards the social workers. C. Huntington, *supra*, at 1121. L.M.'s actions in this regard do not suggest that her illness was dominating her life to the extent that K.M. was at risk of a significant and specific harm. *Compare In re E.H.*, 718 A.2d at 170–71.

**6.** Although we have at points in this opinion discussed the weight of various pieces of evidence in isolation, we understand that the sufficiency of the evidence must in the end be assessed in light of the evidence taken as a whole, viewed in the light most favorable to the magistrate judge's findings. *See, e.g., In re N.P.*, 882 A.2d at 247. It is in that light that we conclude that the evidence in this case was insufficient.

statute is a remedial enactment designed to protect the welfare of neglected and abused children, and it must be liberally construed to achieve that end." *In re P.B.*, 54 A.3d 660, 665 (D.C.2012) (internal quotation marks and brackets omitted). On the other hand,

> [T]he question whether the state should interpose itself into the relationship between a parent and child is a sensitive one. The primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. Although we view the welfare of the child as paramount[,] the child's best interest is presumptively served by being with a parent, provided that the parent is not abusive or otherwise unfit. State intervention in the lives of families does not come without cost to the child. As one commentator has observed, "there is substantial evidence that, except in cases involving very seriously harmed children, we are unable to improve a child's situation through coercive state intervention. In fact, under current practice, coercive intervention frequently results in placing a child in a more detrimental situation than he would be in without intervention."

*In re G.H.*, 797 A.2d 679, 685 (D.C.2002) (quoting Michael Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 Stan. L.Rev. 985, 993 (1975)) (internal citations, brackets, and other internal quotation marks omitted).

Keeping in mind these competing considerations, we are unable to uphold an adjudication of neglect that rests so heavily on generalized predictions that a parent's condition "could" interfere with parenting or adversely affect a child's mental or emotional health to unspecified degree. There are many circumstances in which a child's mental or emotional health "could" be adversely affected to some degree by a parent's condition or situation—including divorce, mental-health problems, and substance-abuse problems. *See, e.g.,* Janet R. Johnson, *High–Conflict Divorce,* 4 CHILDREN AND DIVORCE 165, 165 (1994) ("[C]hildren of high-conflict divorce ... are two to four times more likely to be clinically disturbed in emotions and behavior compared with national norms."); Janice L. Cooper et al., Nat'l Center for Children in Poverty, *Socio-emotional Development in Early Childhood,* Aug. 2009, at 4 ("Specific family and environmental factors can make a child more vulnerable to social, emotional and behavioral problems.... [R]isk factors [including] substance use [and] mental health conditions ... may contribute to behavioral problems among young children as early as age 3..... Young children with these family risk factors have been found to be two to three times more likely to experience problems with aggression ... [,] anxiety and depression ... [,] and hyperactivity."). Moreover, such circumstances are unfortunately widespread. *See, e.g.,* U.S. Dep't of Health Human Servs., Nat'l Ctr. for Health Statistics, *Cohabitation, Marriage, Divorce, and Remarriage in the United States,* July 2002, at 17 ("After 10 years, one-third of first marriages have disrupted [due to either separation or divorce]."); Ronald C. Kessler et al., 62(6) ARCH. GEN. PSYCHIATRY 617, 617 (2005) (concluding that 26.2 percent of adults suffer from diagnosable mental disorder); U.S. Dep't of Health Human Servs., Nat'l Inst. on Drug Abuse, *Drug Facts: Nationwide Trends,* Dec. 2012, at 3 ("In 2011, an estimated 21.6 million Americans (8.4 percent) needed treatment for a problem related to drugs or alcohol...."). Our neglect statute cannot reasonably be understood to permit the removal of children based on the existence of such circumstances alone, in the absence of con-

crete evidence of harm or substantial risk of serious harm.[7]

In sum, we conclude that the evidence presented at the evidentiary hearing in this case was not sufficient to support a finding of neglect. The adjudication of neglect is therefore

*Reversed.*

Dissenting opinion by Senior Judge BELSON.

BELSON, Senior Judge, dissenting:

I dissent from the majority's reversal of the Superior Court judgment that K.M. is a neglected child pursuant to D.C.Code § 16–2301 9(A)(ii) and (iii) (2012). Rather, I agree with K.M.'s Guardian *ad Litem*, the magistrate trial judge and appellee District of Columbia that the evidence was sufficient to establish neglect by a preponderance of the evidence. I also point out that even though the majority concludes the evidence presented at trial was insufficient to establish neglect, it also takes judicial notice of the recent order from the Family Court that awarded K.M.'s maternal grandmother, V.J., permanent guardianship of K.M.[1] I will say more below about this salutary development in the troubled life of K.M. but, given the record before us, I suggest that the most appropriate course for this court to take in the

circumstances is not to reverse the judgment of neglect, and thereby put the guardianship at risk, but instead to remand the case to the Superior Court so that it might have the opportunity to consider additional evidence of neglect that was apparently available but not made a part of the record, and thus not considered at trial. D.C.Code § 17–306 (2001); D.C. Fam. Ct. R. D(e)(1)(b).

## I.

At the heart of the fact pattern giving rise to this case is the delusional disorder, persecutory type, suffered by the unfortunate L.M., mother of respondent K.M., who was eleven years of age at the time this case was petitioned. K.M. and L.M. were living by themselves in a transitional emergency housing unit in Northwest Washington at the time. L.M.'s mental condition was causing her to have bizarre thoughts and beliefs not based in reality. She believed, for example, that imaginary persons named the Smalls and the Tuckers began to harass her commencing in 1993, when she lived in Georgia, and followed her when she moved back to the Washington area. She told Dr. Susan Theut, a psychiatrist who conducted a court-ordered forensic psychiatric evaluation of L.M., that the Smalls and the Tuckers

---

7. The dissenting opinion contends that even if the evidence actually admitted at the hearing was insufficient to support a finding of neglect, this court should remand for further proceedings, to permit consideration of additional information that was available but was not admitted into evidence. *Infra* at 240–43. We decline to adopt such a course in this case, for two reasons. First, the parties have not asked us to do so and have not briefed the question whether on balance such a course would be prudent. We are particularly uncertain on that point given that there have been substantial subsequent developments in this case, including a recent order granting permanent guardianship to K.M.'s maternal

grandmother. Second, as the dissent points out, *infra* at 243, if the District wished to do so, it could file a new neglect petition and seek to introduce whatever evidence it believed supported a finding of neglect. Finally, we express no opinion on the possible implications of our ruling today for the order granting permanent guardianship to K.M.'s maternal grandmother. We leave that potentially complex matter to the parties and the trial court in the first instance.

1. See Majority Opinion, at 237 n. 7 (noting this significant development in K.M.'s case while this appeal has been pending).

meant to hurt her, and had broken into her home, gone through her belongings and had stolen things from her. Illustrative of how bizarre her thinking had become was her statement to Dr. Seth King, a psychologist, that the Smalls and Tuckers had driven through her neighborhood in a car, throwing eggs at her and "mooning" her as they drove by. L.M. had written to the FBI, CIA, and U.S. Marshals Service about the misdeeds of her imaginary tormentors.

On September 30, 2010, the Child and Family Services Agency (CFSA) received a child abuse and neglect hotline call concerning L.M.'s mental health and her ability to care for her son, K.M. A CFSA investigator, Guillermo Cintron, interviewed L.M. at her home the next day. Based on her responses, he became concerned that she might be suffering from paranoia. But because the housing unit was clean and there was ample food, he decided not to remove K.M. from the home. Social worker Meghan Snyder had a separate lengthy conversation with K.M. about L.M. while Cintron spoke with her, but was not called to testify at trial, a matter I discuss below.

Greater concern about L.M.'s mental condition arose when Cintron interviewed K.M. at school a week later. Cintron testified he received a second hotline report assigned for immediate referral, which required a response within two hours. Cintron met K.M. in a private room at his school, where Cintron noted K.M. appeared a bit "timid," and he "kept putting his eyes looking downward."

Cintron testified that "K. stated that his mother had told him that she was going to knock his bricks off," at which point opposing counsel objected, but was overruled. The court determined that K.M.'s out-of-court statement was not hearsay because it was being admitted only to show the effect of the statement on Cintron and others at CFSA. Cintron then clarified for the court that K.M. told him that to knock one's bricks off means to "hurt you really bad." Cintron then related K.M.'s telling of the events that led up to his mother's threat, and how, afterwards, he had gone to bed and he could hear his mother singing along with the radio and intermittently saying "shut up K." even though he was lying quietly in his bed.

Cintron then asked K.M. if he felt safe going home, to which K.M. replied that "he did not feel safe," and "he didn't know what his mother was going to do to him." L.M.'s counsel objected on grounds of hearsay but the government countered, arguing that the statement was admissible under the present state-of-mind exception to the hearsay rule. *See* FED.R.EVID. 803. The magistrate judge disagreed, finding that the timing was not right. Explaining her ruling, the magistrate judge continued, "I think it would go to if K. were experiencing something—at this point, K. was just talking about something he was experiencing allegedly as opposed to actually something he had been experiencing." In so ruling, I suggest, the magistrate judge erred, and Cintron's response should have been considered by the magistrate judge,[2]

**2.** A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, but that discretion must be based upon correct legal standards. *Jones v. United States*, 17 A.3d 628, 631 (D.C.2011) (citing *Blackson v. United States*, 979 A.2d 1, 6 (D.C.2009)). We review the legal question whether an out-of-court statement satisfies a particular hearsay exception *de novo. Id.* Here, the trial court ruled that K.M.'s out-of-court statement that he felt afraid to go home was not admissible under the present state-of-mind exception to the hearsay rule. The state-of-mind exception "permits the use of hearsay statements for the limited purpose of showing the state-of-mind of the declarant if the declarant's state of

even though it was not necessary to establish neglect by a preponderance of the evidence.

In arriving at the conclusion that K.M. was a neglected child, the magistrate judge considered the testimony of the two expert witnesses who interviewed L.M. and testified that she suffered from delusional disorder, persecutory type. The majority opinion states at page 231 that we must "focus our inquiry on whether there is sufficient evidence in the record that, as a result of his mother's mental illness, K.M.'s emotional and mental health either had been harmed or was threatened with harm to a degree permitting a finding of neglect." I agree, and submit that an examination of the record shows clearly that there is adequate evidence to make the requisite showing.

The majority opinion also states, citing *In re A.H.*, 842 A.2d 674, 685–86 (D.C. 2004), that regarding future harm, the government must establish a "substantial risk of serious harm." The record in this case does that as well, as I will explain.

I begin with pertinent language from our opinion in *In re A.H.*:

In evaluating on appeal whether the District shouldered that burden, we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences. Deference is due to the trial court's determination of abuse or neglect and we will not second-guess the trial judge on a very difficult call.

*In re A.H., supra*, 842 A.2d at 684 (internal quotations and citations omitted).

Adherence to the principles recognized in *In re A.H.* calls for affirmance by this court. Two expert witnesses testified to the threat of harm to K.M. posed by L.M.'s mental illness and her resulting bizarre behavior. The magistrate judge credited their testimony and summarized the testimony of one of them as follows: "Dr. King felt that the psychological and emotional harm [K.M.] would suffer *would be significant* if [L.M.] did not successfully engage in treatment." (emphasis supplied). This characterization of Dr. King's testimony was accurate. The following excerpts from that testimony support the magistrate judge's finding of potential significant harm:

- "[L.M.] denies that there is anything wrong with the way she is thinking about these conspiracies. She believes that they're true, she believes that they're real, and she does not believe that there's anything negatively impacting her functioning or parenting abilities."

- "I don't think she is willing to seek treatment. I think she would be highly resistant to treatment[,] . . . [b]ecause she does not think that there is any reason for treatment."

- Dr. King listed the several negative outcomes expected from a parent with a disorder like L.M.'s: "There would be an impairment in ability to parent a child in that the lack of insight, poor judgment could affect decision-making. The focus and preoccupation

mind is at issue at trial." *Id.* at 632 (internal quotation marks omitted). The state-of-mind exception extends to statements of present mental states and emotions. *Burgess v. United States,* 608 A.2d 733, 738 (D.C.1992).

In this case, the court was tasked with determining whether K.M.'s mother had

failed, or was unable, to provide K.M. parental care. K.M.'s concern about his mother's threats and his resulting concern that he was not safe at home are relevant to the central issue of the trial.

with the belief that someone is out to get her, or against her, could interfere with her ability to focus on the needs of the child. Also, it could interfere with her ability to work collaboratively with others such as school personnel, to be trusting enough to receive assistance if her child needed any assistance. Also, there's a matter of modeling for a child when you're a parent ... [and][t]he youth could adopt that way of thinking, that way of being distrustful, not wanting to work with others."

• Dr. King also opined that if a child were to witness his parent talking to people that weren't there, "[t]hat could be frightening for the child [and] it could be confusing for the child. The child could either start believing that there are other people to talk to that are actually not there. Or the child could eventually believe that the parent does have problems with reality ... which could impact that child's ability to respect that parent or to believe in that parent's authority."

In addition, Dr. King testified: "A child's interactions with the parents paves the way for the formation of relationships later on. This could have a serious impact on the child's nature of relationships [*sic*] that they have with others, having a stable basis or stable model for appropriate relationship." Dr. King also concluded that if L.M. did not seek treatment for her mental condition, "[her delusional disorder, persecutory type] will have a negative impact on her ability to appropriately and effectively parent K." He added that this "delusional disorder and the manifestation of it by his mother ... *would have an impact on [K.M.]* " (emphasis supplied). Dr. King's testimony established the substantial risk of serious harm required for a showing of neglect.

The government's other expert witness, psychiatrist Dr. Theut, testified consistently to significant ill effects that K.M. would experience as a result of L.M.'s unfounded beliefs and the way she treated K.M. She testified that "children raised around people who have a delusional disorder *become very scared and frightened.*" [3] (emphasis supplied). Thus, this expert witness too testified to a significant harm.

## II.

For the reasons I have set out, this court should affirm the judgment of the Superior Court. But if that judgment is not upheld, the appropriate action by this court is a remand rather than a reversal.

It is noteworthy that the Superior Court judge who reviewed the ruling of the magistrate judge considered other significant material in the file that was not placed in evidence at trial. Appellant's principal argument for reversal is that the reviewing judge failed to confine her evaluation of

3. Dr. Theut described the ability of a parent with a delusional disorder like L.M. to independently parent a child as "extremely poor." When asked to elaborate, she explained that when a child is exposed to the parent's paranoia, "the child could then become fearful of other people, wondering if they're going to hurt them also." Also, Dr. Theut was concerned that over time, the child may "merg[e] with the personality of the parent who has the delusional disorder," leaving the child "[un-]able to discriminate between what is a delusion and what is reality." Dr. Theut opined that the "long-term effects on a child that is parented by an individual with the same behaviors exhibited by Ms. M absent any treatment," would include "concerns about [the child's] ability to trust others in the future, [and the ability to] differentiate between the delusions and reality." Dr. Theut added, "I think reunification would be very problematic if she doesn't seek treatment." Dr. Theut also testified that, "specifically" speaking about L.M.'s ability to parent K.M., if she did not seek treatment, would be "very poor."

the magistrate's ruling to the trial record;[4] and the District acknowledges that the reviewing judge should have so confined it.[5] If the reviewing judge was of the view that the record at trial should have included other significant and available evidence of neglect, the judge could have remanded the case to the magistrate judge so that the magistrate judge and the District, having been made aware of the reviewing judge's assessment of the value of such evidence, could decide whether it should be considered at a reopened trial procedure. *See* D.C. Fam. Ct. R. D(e)(1)(b) (discussed further below); *see also In re M.D.,* 758 A.2d 27, 34 (D.C.2000) ("[T]he trial court in a neglect proceeding ought not to be passive in the face of what it recognizes is a deficient presentation of evidence. In such a case the court may and should take affirmative steps to ensure that it has enough evidence before it to make an informed decision."). As I have explained, however, the record evidence of neglect is sufficient to establish neglect by a preponderance of the evidence, even without the extra-record material the reviewing judge took into account. Thus, any error on the part of the reviewing judge in considering such material was harmless. But the availability of such material raises the question whether, if this court does not affirm, it should, in the best interest of K.M., remand this case so the magistrate judge, aided by the submissions of the parties, could determine whether to reopen the fact-finding hearing to consider additional evidence, and could also ascertain whether, in light of changed circumstances, appellant L.M. has changed her position.[6]

The reviewing judge quoted at length from the account that social worker Meghan Snyder set forth in the Neglect Complaint Referral Form. The conversation she had with K.M. during Mr. Cintron's initial interview with L.M. indicates that K.M. was experiencing fear and anxiety as a result of his mother's continuing delusions:

> [K.M.] stated that his mother thinks people go through her "undies". [K.M.] shared his mother talks to herself at times, he believes his mother is "crazy". [K.M.] states this is because she talks to herself and sometimes gets mad. According to [K.M.], when his mother gets mad she says things such as she is going to kill and blow "smalls" brains out. When asked who "Smalls" was, [K.M.] stated he is a character she made in her head. [K.M.] described his mother doing things like people on "Criminal Minds". [K.M.] stated his mom yells at his grandmother, and other family members who are part of the "group" she describes. [K.M.] stated his mother has said she is going to buy a gun on the street. [K.M.] stated that he believes she will. [K.M.] stated that if strangers on the street look at his mother and then look forward, she might say something like "what the F are you looking at?" [K.M.] shared that his mom will sometimes call family members for food and when they bring food, she gets mad at them and doesn't want them to help. [K.M.] shared he has seen his mother arguing with family and friends. [K.M.] stated he worried about getting hurt during these fights.

It would be for the trial court to rule in the first instance on the admissibility of

---

**4.** Brief for Appellant at 21, *In re K.M.* (2013) (No. 11–FS–1234).

**5.** Brief for Appellee at 22, *In re K.M.* (2013) (No. 11–FS–1234).

**6.** As noted at page 32 above and discussed below, while this appeal has been pending, the Family Court awarded permanent guardianship to K.M.'s maternal grandmother.

such testimony by social worker Snyder if the District offered it at a further hearing on remand. It can be argued that it reflects the fear and deep concern that were part of K.M.'s state of mind as a result of his mother's mental condition and attendant bizarre behavior.[7] K.M. was unavailable to testify himself about the matters he described to Snyder, as well as the events he described later to Cintron, because the magistrate judge had granted the Guardian *ad Litem's* request that K.M. not be called as a witness because of the harm that testifying would cause him. *In re Jam.J.*, 825 A.2d 902, 916–17 (D.C.2003).

The reviewing judge considered a few other matters that had not been included in the record of trial. They included records from the D.C. school attended by K.M. and written medical reports by Dr.

King and Dr. Theut that were not fully brought out when they testified at trial. At a further hearing on remand, any such relevant evidence can be offered by the District.

I note that in a criminal case, when insufficiency of evidence is a ground for reversal, a further trial would not be available because of double jeopardy considerations. In civil actions it is occasionally available.[8] In Family Division matters, however, where the paramount consideration is the best interest of the child, there is little reason to forego further proceedings that may serve that interest. This court has the authority under D.C.Code § 17–306, to "remand the cause and ... require such further proceedings to be had, as is just in the circumstances." [9]

---

7. In affirming the magistrate's order, the Superior Court judge noted that K.M.'s fear of his mother is itself evidence of the type of emotional harm that would support a finding of neglect under D.C.Code § 16–2301(9)(A)(ii). Indeed, this court has held that a child's fear, caused by some action by the parent, can provide the basis for a finding of neglect. In *In re NP*, 882 A.2d 241 (D.C. 2005), an older sister testified that the young subject of child abuse, I.P., ran to her room and hid under her bedcovers every time her parents began to yell at each other. We found this to be "strong evidence" that I.P. was "profoundly affected" by her parents' behavior. *Id.* at 248.

On further proceedings, the trial court would be able to consider K.M.'s verbal expression of his fear in the same way that it used I.P.'s physical expression of her fear—as circumstantial evidence of emotional harm suffered by the neglected child. K.M.'s statements to Ms. Snyder would not be considered for the truth of each individual statement, *e.g.*, not to establish that L.M. intended to purchase a gun and blow the head off of "Smalls." Rather, they would be admitted as evidence of the emotional harm suffered by K.M.—out-of-court statements used only as circumstantial evidence of K.M.'s fear. *See Bennett v. United States*, 375 A.2d 499, 503 (D.C.1977) (noting that victim's statement, "D

threatened to kill me" can be treated as circumstantial evidence of victim's fear of D, but cautioning that instructions must be given to the jury so that they do not consider it for its truth); *see also* DAVID F. BINDER, HEARSAY HANDBOOK §§ 2:7, 2:9 (4th ed. 2012). In a jury trial, the court would have to give instructions so that the jury will not consider the statements for their truth. But in a non-jury trial, such as this one, the judge is "presumed to be able to know the proper use of evidence." *(Melvyn) Johnson v. United States*, 636 A.2d 978, 981 (D.C.1994). K.M.'s statement to the social worker could provide circumstantial evidence of the emotional harm—the fear—experienced by K.M., relevant to a showing of neglect.

8. *See* Super. Ct. Civ. R. 59(a).

9. D.C.Code § 17–306 states in full:

The District of Columbia Court of Appeals may affirm, modify, vacate, set aside or reverse any order or judgment of a court or any division or branch thereof, or any administrative order or decision, lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate order, judgment, or decision, or require such further proceedings to be had, as is just in the circumstances.

The Superior Court Family Division rules give similar authority to Superior Court judges who are reviewing a magistrate judge's order or judgment. General Family Court Rule (D)(e)(1)(B) provides that the reviewing judge "may affirm, reverse, modify, or remand, in whole or in part, the magistrate judge's order or judgment and enter an appropriate order of judgment."

This court can enter an order directing or authorizing a further trial proceeding in this case. *See In re M.D., supra,* 758 A.2d at 34. Here, because K.M.'s grandmother has been awarded permanent guardianship over K.M., the most appropriate course would be a remand so that a further fact-finding hearing could be held by the magistrate judge, in which all relevant evidence, including the extra-record evidence relied on by the reviewing Superior Court judge, could be presented to aid in the court's neglected child determination. This court has authority, in supervising the actions of the Superior Court as *parens patriae,* to order such a course to protect the best interests of K.M., even though no party has requested it. *See In re M.D., supra,* 758 A.2d at 33, 34. It is true that if this court reverses, the District is free to re-petition the matter, but a reversal of the adjudication of neglect will place in some jeopardy the order granting K.M.'s grandmother permanent guardianship.[10] Thus a remand is preferable to a reversal.

The guardianship of K.M. by his grandmother, V.J., appears to be highly beneficial to K.M.[11] This court can take judicial notice of the findings of fact and conclusions of law set forth in the order granting guardianship. *See Christopher v. Aguigui,* 841 A.2d 310, 311 (D.C.2003). The facts found, of course, are not evidence to be considered in evaluating the sufficiency of

---

10. Under D.C.Code § 16–2383(a), "[a] guardianship order may not be entered unless the child has been adjudicated to be neglected pursuant to section 16–2317...."

11. The findings of fact and conclusions of law underlying the trial court's order granting K.M.'s grandmother's motion for permanent guardianship are significant, not as matters to be considered in deciding whether to affirm or reverse the finding of neglect being appealed, but to advise this court of the present posture of the proceedings, and to inform this court on such things as the whereabouts of the parties and K.M.'s current living arrangements.

K.M. has been living with his maternal grandmother, V.J., in Albany, Georgia for two years. They live in a home on three acres of land, K.M.'s maternal uncle lives there as well. They each have their own bedroom. The uncle plays catch with K.M. and helps him with his homework. It appears that K.M.'s mother, L.M., lives in the area also, as she usually visits K.M. once a week, and sometimes twice. K.M.'s father also lives in the area, and visits K.M. at times.

V.J. testified concerning L.M.'s history of mental illness, including physical outbursts and threats to others, such as store cashiers. L.M. regularly talks about people who are plotting against her, especially the Browns and Tuckers, and how she will retaliate against them. On one occasion V.J. had to call police after an incident in which her daughter, L.M., tried to fight her. Sometimes, L.M. does not recognize her mother, V.J., but thinks she is a member of one of the families that L.M. thinks torment her.

K.M. is doing well in school and plays basketball and football. V.J. has been driving him to school each morning. V.J. testified that K.M. and L.M. love each other. However contact with his mother sometimes makes K.M. angry, for example, when L.M. talks about how computers control her thoughts. At such times, K.M. makes faces and does not want to talk with L.M., and V.J. sometimes gets K.M. to leave the room. On occasion V.J. has stopped a few of L.M.'s visits.

K.M., who is now fourteen years old, expressed in open court his consent to the guardianship. The magistrate judge considered all of the factors set out in D.C.Code § 16–2383(d), found they all support guardianship in this case, and accordingly entered the order granting V.J.'s motion for Permanent Guardianship.

the showing of neglect in this appeal, but this court is aware of the effect that a reversal can have upon ongoing proceedings in the trial court. It will be for the trial court to handle this case after a reversal in such a way that, if possible, the Permanent Guardianship is not discontinued or interrupted pending the outcome of any further proceedings on the issue of neglect.[12] It will also be for the trial court to take any other available steps to prevent or manage disruptions of the seemingly stable life that K.M. has, according to the Guardianship order, been leading during the last two years.

For the foregoing reasons, I respectfully dissent.

12. The record before us gives no indication whether authorities in Georgia, where all interested parties apparently are residing at this time, would be disposed to take action if necessary in K.M.'s best interest.